# In the United States Court of Federal Claims

No. 13-1011C
Filed: August 20, 2015

| | |
|---|---|
| RON ESTES, Treasurer of the State of Kansas, | ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) ) ) ) |
| THE UNITED STATES OF AMERICA, | ) ) |
| Defendant. | ) ) ) |

RCFC 12(b)(1); RCFC 12(b)(6);
U.S. Savings Bonds; 31 C.F.R. § 315.20;
"Valid, Judicial Proceedings"; Title-Based
Escheat; Breach of Contract; Third-Party
Beneficiary; Fifth Amendment Taking

*J. Brett Milbourn*, Walters, Bender, Strohbehn & Vaughan, P.C., Kansas City, KS, with whom was *David Charles Frederick*, Kellogg, Huber, et al., Washington, DC, for Plaintiff.

*Kenneth David Woodrow*, with whom were *Stuart F. Delery*, Assistant Attorney General, *Robert E. Kirschman*, Jr., Director, and *Steven Gillingham*, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, for Defendant. *Theodore C. Simms, II*, Bureau of Fiscal Service, U.S. Department of Treasury, Washington, DC, Of Counsel for Defendant.

## OPINION AND ORDER

**KAPLAN, Judge.**

In this action, Plaintiff Ron Estes, Treasurer of the State of Kansas ("Kansas" or "the State"), requests an award of damages equal to the matured value (plus interest) of all lost, stolen, destroyed or otherwise abandoned U.S. savings bonds that are registered to individuals with last known addresses in Kansas. According to Kansas, it has succeeded to ownership of these bonds by virtue of a state court judgment in which title to the bonds escheated to the State under the Kansas Disposition of Unclaimed Property Act, Kan. Stat. Ann. § 58-3979 (West 2000).

In its complaint, Kansas states its belief that the value of the abandoned bonds is in excess of $151 million. It asserts a number of causes of action, including, among others, breach of contract, equitable estoppel, and Fifth Amendment takings. Kansas also seeks an accounting

of the benefits to which it claims entitlement, including serial numbers, addresses, and other information that would identify those bonds registered with last known addresses in the State of Kansas.

Before the Court is the government's motion to dismiss for lack of jurisdiction under Rule 12(b)(1) of the Rules of the Court of Federal Claims ("RCFC") and for failure to state a claim under RCFC 12(b)(6). For the reasons that follow, the government's motion under Rule 12(b)(1) is **DENIED**. Its motion to dismiss pursuant to Rule 12(b)(6) is **GRANTED IN PART AND DENIED IN PART**.

## BACKGROUND

### I.     The United States Savings Bond Program

Pursuant to its power "[t]o borrow money on the credit of the United States" under Article I, section 8, clause 2 of the Constitution, Congress has delegated authority to the Secretary of the Treasury ("the Secretary"), with the approval of the President, to issue savings bonds, the proceeds of which may be used "for expenditures authorized by law." 31 U.S.C. § 3105(a); <u>Free v. Bland</u>, 369 U.S. 663, 666-67 (1962). The statute gives the Secretary the authority to prescribe regulations governing, among other things, the bonds' investment yield, maturity period, redemption, ownership and transfer. <u>See</u> § 3105(b)-(c). These regulations appear in Title 31 of the Code of Federal Regulations, Parts 315, 353, and 360.[1]

Section 315.5 provides that the person to whom a bond is registered is the owner of the bond. 31 C.F.R. § 315.5(a) ("Registration is conclusive of ownership."). The regulations do not impose any time limits for bond owners to redeem the savings bonds that are the subject matter of this case. Therefore, owners can present them for payment at any time. <u>See</u> 31 U.S.C. § 3105(b)(2)(A) (authorizing the Secretary to promulgate regulations providing that "owners of savings bonds may keep the bonds after maturity"). As of 1989, and at least up through 2012, the Department of the Treasury ("Treasury") was receiving claims of $7,000 to $10,000 a day for payment on savings bonds that had matured many years earlier. <u>Treasurer of N.J. v. U.S. Dep't of Treasury</u>, 684 F.3d 382, 388 (3d Cir. 2012).[2]

---

[1] Savings bonds are issued in various Series, designated by letters of the alphabet. Part 315 of Title 31 of the Code of Federal Regulations governs Series A, B, C, D, E, F, G, H, J, and K. Part 353 governs Series EE and HH. Part 360 governs Series I. In general, the corresponding sections of each part—e.g., §§ 315.5, 353.5, and 360.5—are identical. The bonds at issue in this case are Series E, A-D, F, G, H, J, and K, and therefore are subject to Part 315. Compl. ¶ 44.

[2] The relevant statutes and regulations do not contain provisions for locating owners of matured but unredeemed bonds. In 2000, the Treasury Department created a "Treasury Hunt" website, which provides information on matured but unredeemed Series E bonds issued after 1974 in a database searchable by Social Security Number. <u>Treasurer of N.J.</u>, 684 F.3d at 388-389.

Section 315.15 provides that savings bonds are "not transferable and are payable only to the owners named on the bonds, except as specifically provided in these regulations and then only in the manner and to the extent so provided."  31 C.F.R. § 315.15.  This case concerns the interpretation of the Secretary's regulations governing the redemption of bonds by parties other than their registered owner.  In particular, 31 C.F.R. § 315.20(b) provides that:

> The Department of the Treasury will recognize a claim against an owner of a savings bond and conflicting claims of ownership of, or interest in, a bond between coowners or between the registered owner and the beneficiary, if established by valid, judicial proceedings, but only as specifically provided in this subpart. Section 315.23 specifies the evidence required to establish the validity of the judicial proceedings.

## II.   States' Unclaimed Property Statutes and Their Claims for Payment on Savings Bonds

Historically, at least as early as the 1950s, states have sought to recover the proceeds from matured but unredeemed savings bonds pursuant to their unclaimed property statutes. Treasurer of N.J., 684 F.3d at 390.  Most of these state statutes have been based on the Uniform Unclaimed Property Act ("Uniform Act").  Id. at 389.  Under the Uniform Act, a state may acquire rights to abandoned property if the last known address of the apparent owner is in the state.[3]  Uniform Unclaimed Property Act § 4 (1995), available at http://www.uniformlaws.org/shared/docs/unclaimed%20property/uupa95.pdf.

The Uniform Act is rooted in the common-law doctrine of escheat, Treasurer of N.J., 684 F.3d at 389, under which "[s]tates as sovereigns may take custody of or assume title to abandoned . . . property."  Delaware v. New York, 507 U.S. 490, 497 (1993).[4]  Under the Uniform Act—and consequently, under many states' unclaimed property acts—"the State does not take title to unclaimed property, but takes custody only, and holds the property in perpetuity for the owner."  Uniform Unclaimed Property Act prefatory note.  As explained in greater detail below, however, the Kansas statute at issue in this case, as amended in 2000, allows the State to take title as well as custody to unclaimed U.S. savings bonds, based upon a state court judgment.

In 1952, Treasury issued Bulletin No. 111, setting forth its position with respect to "state statutes purporting to vest abandoned property, including United States securities, in certain State

---

[3] To register a savings bond, the owner completes a registration form, on which the owner identifies his or her address at the time of registration.  Treasury initially kept registration records for Series E savings bonds on paper but later converted the paper records to microfiche. Treasury is currently in the process of digitizing those records.  Compl. ¶ 46.

[4] "At common law, abandoned personal property was not the subject of escheat, but was subject only to the right of appropriation by the sovereign as bona vacantia.  [Supreme Court] opinions, however, have understood 'escheat' as encompassing the appropriation of both real and personal property. . . ."  Delaware v. New York, 507 U.S. at 497 n. 9 (internal citations omitted).

officers." Pl.'s Resp. to Def.'s Mot. to Dismiss [hereinafter "Pl.'s Resp."] App. 281.  The Bulletin reproduced a letter dated January 28, 1952 [hereinafter the "Escheat Decision"] from the Secretary to the Comptroller of the State of New York.  Pl.'s Resp. App. 281-84; Treasurer of N.J., 684 F.3d at 390.  In that letter, the Secretary explained that Treasury would pay the proceeds of savings bonds to New York if it actually obtained title to the bonds based upon a judgment of escheat, but it would not do so if the state merely acquired a right to take custody of the proceeds.  Pl.'s Resp. App. 283-84; Treasurer of N.J., 684 F.3d at 390.  The Secretary reasoned as follows:

> "[p]ayment according to [the] explicit terms of [the] regulations is plainly an obligation of the Government . . . .  But even where no explicit reference is made in the regulations to a particular case, the Department will pay one who succeeds to the title of the bondholder.  This is not regarded as a violation of the agreement, but, on the contrary, as payment to the bondholder in the person of his successor or representative.  Thus, although the regulations do not mention such a case, the Department recognizes the title of the state when it makes claim based upon a judgment of escheat.

Id. App. 283.

More recently, Treasury articulated the same position in a page on its website entitled "EE/E Savings Bonds FAQs."  Pl.'s Resp. App. 289-90 (providing a screenshot of the FAQs page).  Among a list of frequently asked questions, the page poses the following: "In a state that has a permanent escheatment law, can the state claim the money represented by securities that the state has in its possession[?]  For example, can a state cash savings bonds that it's gotten from abandoned safe deposit boxes?"  Pl.'s Resp. App. 290.  Treasury's answer mirrors the position it stated in the Escheat Decision:

> The Department of the Treasury will recognize claims by States for payment of United States securities where the States have succeeded to the title and ownership of the securities pursuant to valid escheat proceedings. The Department, however, does not recognize claims for payment by a State acting merely as custodian of unclaimed or abandoned securities and not as successor in title and ownership of the securities.

Id.

Since promulgating its view distinguishing between custody- and title-based escheat statutes, Treasury has cited it consistently to defeat claims for payment on unredeemed savings bonds by states with custody-based unclaimed property statutes.  See, e.g., Treasurer of N.J., 684 F.3d at 391 (noting the parties' stipulation that Escheat Decision "'is defendants' interpretation of federal savings bond regulations . . . and reflects defendants' understanding of existing laws" and that "the Department has no intention of deviating from the statement").  As recently as April of 2013, the Solicitor General, opposing the State of Montana's petition for certiorari seeking review of the Third Circuit's decision in Treasurer of New Jersey, observed that: (1) "the Department [of Treasury] has long advised the States that to receive payment on a U.S. savings

bond a State must complete an escheat proceeding that satisfies due process and that awards title to the bond to the State, substituting the State for the original bondholder as the lawful owner"; and (2) "given the regulatory prohibition on payment to anyone other than the lawful owner, the Department has also made clear that it will not make payment to a State on a bond if a State does not obtain title to the bond but instead merely seeks 'custody' of bond proceeds until the bondholder redeems the bond." Pl.'s Resp. App. 9.

## III.    Kansas's Unclaimed Property Act and Escheatment Proceedings

Prior to 2000, Kansas's unclaimed property statute allowed the state to take custody of, but not title to, such property. Pl.'s Resp. 14. In 2000, however, the Kansas legislature amended the statute specifically to allow Kansas to take title to unclaimed U.S. savings bonds. Id. Thus, the Kansas Disposition of Unclaimed Property Act now provides:

(a) . . . United States savings bonds which are unclaimed property[5] . . . shall escheat to the state of Kansas three years after becoming unclaimed property . . . and all property rights to such United States savings bonds or proceeds from such bonds shall vest solely in the state of Kansas.

(b) Within 180 days after the three years in subsection (a), if no claim has been filed [with the administrator] . . . for such United States savings bonds, the administrator shall commence a civil action in the district court of Shawnee county for a determination that such United States savings bonds shall escheat to the state. The administrator may postpone the bringing of such action until sufficient United States savings bonds have accumulated in the administrators [sic] custody to justify the expense of such proceedings.

(c) If no person shall file a claim or appear at the hearing to substantiate a claim or where the court shall determine that a claimant is not entitled to the property claimed by such claimant, then the court, if satisfied by evidence that the administrator has substantially complied with the laws of this state, shall enter a judgment that the subject United States savings bonds have escheated to the state.

_____

[5] Under § 58-3935(c) of the Kansas Disposition of Unclaimed Property Act, "[p]roperty is unclaimed if,"

for the applicable period set forth in subsection (a) [for the specific type of property], the apparent owner has not communicated in writing or by other means reflected in a contemporaneous record prepared by or on behalf of the holder, with the holder concerning the property or the account in which the property is held, and has not otherwise indicated an interest in the property. A communication by an owner with a person other than the holder or the holder's representative who has not in writing identified the property to the owner is not an indication of interest in the property by the owner.

(d) The administrator shall redeem such United States savings bonds escheated to the state and the proceeds from such redemption of United States savings bonds shall be deposited in the state general fund . . . .

Kan. Stat. Ann. § 58-3979.

Pursuant to this statutory scheme, on January 3, 2013, Kansas filed a Petition for Declaratory Judgment in the district court of Shawnee County, Kansas, requesting "a determination that all right and legal title in, and ownership of, certain matured, unredeemed United States savings bonds, which are unclaimed property under the Kansas Disposition of Unclaimed Property Act, . . . shall escheat to the State of Kansas." Pl.'s Resp. App. 87 (Petition ¶ 49). Of the bonds referenced in the petition, some were in the physical possession of the Kansas Treasurer ("Bonds in Possession"), whereas others had been "lost, stolen, destroyed, or otherwise made unavailable" and thus were not in the possession of the Kansas Treasurer ("Absent Bonds"). Id. App. 88-89 (Petition ¶¶ 52-53). In Kansas's estimation, the total matured value of the Bonds in Possession is $876,836.18, and the total matured value of the Absent Bonds is approximately $151.8 million. Id.

According to the petition, "extensive efforts were made to identify and verify accurate addresses of bond owners and to the extent possible reunite [the Bonds in Possession] with their owners," but such efforts failed. Id. App. 88. To give notice of the proceedings to the owners whose interests were implicated by them, the court authorized service by publication. Id. App. 157. On March 29, 2013, the court held a hearing on the petition, at which no bond owner appeared. Id. App. 166 (Judgment of Escheatment 8). After reviewing the evidence, the court entered a judgment of escheatment, in which it declared that all rights and legal title to, and ownership of both the Bonds in Possession and the Absent Bonds, "shall escheat to the State of Kansas." Id. App. 167 (Judgment of Escheatment 9).

## IV.   Requests by Kansas to Redeem the Bonds

On May 13, 2013, Kansas filed a claim with Treasury for redemption of the bonds now owned, according to the Kansas court's escheatment judgment, by the State. Id. App. 251-54. On October 9, 2013, Treasury responded to Kansas's request with respect to the Bonds in Possession, informed Kansas of the redemption procedures, and noted that Treasury anticipated "redeeming [the Bonds in Possession] in the normal course." Id. App. 276-77. Kansas has since delivered the Bonds in Possession to Treasury and received the proceeds. Compl. ¶ 82.

On October 16, 2013, however, Treasury denied Kansas's claim with respect to the Absent Bonds. Pl.'s Resp. App. 279-80. It explained that "under Treasury's regulations, Treasury is bound to its contract with the registered owners of these savings bonds, and would violate that contract if it redeemed them to a third party." Id. App. 279. Further, Treasury observed, "[i]f the registered owner of one of the Absent Bonds were to present that bond, Treasury would be obligated to redeem that bond." Id. According to the letter, Treasury regulations provided that in the absence of an exception or waiver, Treasury could only redeem a savings bond to its registered owner. Id. It asserted that "[e]scheatment claims by states are not

an explicit exception to the conclusive ownership requirements of 31 C.F.R. § 315.5(a)."  Id.
Moreover, the Treasury letter explained, the exceptions to the ownership requirements of 31
C.F.R. § 315.5(a) set forth in § 315.5(b) for "rights established by valid, judicial proceedings"
include only ownership claims pursuant to a divorce decree (§ 315.22(a)) and claims based on
gifts causa mortis (§ 315.22(b)).  Id. App. 279 n.5.

The letter stated that "[i]n the past, Treasury has interpreted its regulations to allow some
state escheatment claims, but only when the state possesses the savings bonds in its claim."  Id.
App. 279-80.  Kansas could not redeem the Absent Bonds, the letter concluded, "because it is not
the registered owner of the bonds, nor does it possess them."  Id. App. 280.

## V.      Kansas's Claims in This Court

On December 20, 2013, Kansas filed this lawsuit.  Its complaint consists of eight counts:
(1) breach of express contract; (2) breach of implied-in-fact contract; (3) breach of fiduciary
duties with respect to express contracts; (4) equitable estoppel; (5) third-party beneficiary
contract; (6) declaratory judgment; (7) Fifth Amendment taking of property for public use; and
(8) action for accounting.  Compl. 22-38.  For counts I, II, III, IV, V, and VII, Kansas seeks
"damages in an amount equal to the matured value, plus applicable interest, of [the Absent
Bonds]—believed to be in excess of $151,800,000," as well as "the expense of this action" and
any "further relief that this Court deems just and equitable."  Compl. 24-25, 27-29, 31, 33, 36.  In
addition, for Count VI, Kansas requests "that this Court enter an order declaring:"

> that Defendants have no right, title, or interest to the Absent Bonds; that Defendant
> has wrongfully asserted custody and/or ownership over Plaintiff's Absent Bonds,
> and failed to turn over to Plaintiff required and necessary information regarding the
> Absent Bonds, namely serial numbers, addresses, and other information which
> would identify those bonds with last known addresses in the State of Kansas; that
> Plaintiff, having been awarded all right, title and interest in the Absent Bonds and
> their proceeds by valid judicial escheat proceedings, should not be deprived of its
> property and Defendant must therefore provide Plaintiff the information necessary
> to identify those Absent Bonds registered with last known addresses in the State of
> Kansas; that Defendant accept Plaintiff's presentment and redemption of the
> subject Absent Bonds; [and] that Plaintiff be awarded [the damages and costs
> specified in Counts I, II, III, IV, V, and VII].

Compl. 35.  Finally, for Count VIII, Kansas requests that this Court order the government to
"provide an accounting of the Absent Bonds, namely serial numbers, addresses, and other
information which would identify those bonds registered with last known addresses in the State
of Kansas, and [the] value of the Absent Bonds and their proceeds," as well as "the expense of
this action" and any other relief.  Compl. at 38.

## VI.     The Government's Motion to Dismiss

The government has moved to dismiss Kansas's complaint.  It contends that Kansas's
contract claims, its equitable estoppel claim, and its declaratory judgment claim must be

dismissed for lack of subject matter jurisdiction pursuant to RCFC 12(b)(1).  Moreover, although it does not dispute that Kansas's takings claim falls within this Court's Tucker Act jurisdiction, the government contends that this claim must be dismissed for failure to state a claim upon which relief can be granted pursuant to RCFC 12(b)(6).

The Court held oral argument on the government's motion to dismiss on October 21, 2014.  Subsequent to the argument, the Court requested and the parties filed two rounds of supplemental briefs.  Most recently, on June 30, 2015, the government submitted a Notice of Proposed Rulemaking, to which Kansas has since responded.

For the reasons that follow, the Court concludes that it has jurisdiction over the claims in the complaint.  Therefore, the government's motion to dismiss under Rule 12(b)(1) is **DENIED**.  The Court further finds that Kansas has stated claims on which relief can be granted with respect to its allegations of breach of contract and a Fifth Amendment taking of property.  On the other hand, it finds that Kansas's allegations do not support a claim for relief as a third party beneficiary.  Therefore, the government's motion to dismiss pursuant to Rule 12(b)(6) is **GRANTED IN PART AND DENIED IN PART**.

## DISCUSSION

### I.    Standards for Motions to Dismiss

In deciding a motion to dismiss for lack of subject matter jurisdiction, the court accepts as true all undisputed facts in the pleadings and draws all reasonable inferences in favor of the plaintiff.  Trusted Integration, Inc. v. United States, 659 F.3d 1159, 1163 (Fed. Cir. 2011).  The court may "inquire into jurisdictional facts" to determine whether it has jurisdiction.  Rocovich v. United States, 933 F.2d 991, 993 (Fed. Cir. 1991).  The burden of establishing jurisdiction is on the plaintiff.  Trusted Integration, 659 F.3d at 1163.

When considering a motion to dismiss for failure to state a claim under RCFC 12(b)(6), the court "must accept all well-pleaded factual allegations as true and draw all reasonable inferences in [the plaintiff's] favor."  Boyle v. United States, 200 F.3d 1369, 1372 (Fed. Cir. 2000).  The motion will be granted when the facts asserted by the plaintiff fail "to raise a right to relief above the speculative level."  Am. Contractors Indem. Co. v. United States, 570 F.3d 1373, 1376 (Fed. Cir. 2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)).  In other words, plaintiff's claim must be plausible on its face.  Twombly, 550 U.S. at 570; Acceptance Ins. Cos., Inc. v. United States, 583 F.3d 849, 853 (Fed. Cir. 2009).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Twombly, 550 U.S. at 556).  "Conclusory allegations of law and unwarranted inferences of fact do not," however, "suffice to support a claim."  Bradley v. Chiron Corp., 136 F.3d 1317, 1322 (Fed. Cir. 1998) (citations omitted).

## II.     Subject Matter Jurisdiction

The United States Court of Federal Claims is a court of limited jurisdiction that, pursuant to the Tucker Act, may hear "any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1) (2012). In addition, the Tucker Act gives this court limited jurisdiction to grant equitable and declaratory relief, but only when such relief is "an incident of and collateral to" a money judgment. 28 U.S.C. § 1491(a)(2); <u>Bobula v. U.S. Dep't of Justice</u>, 970 F.2d 854, 859 (Fed. Cir. 1992).

### A.     Contract-Based Claims[6]

It is well established that savings bonds are contracts between the United States and the owners of the bonds and that the regulations prescribed by the Secretary constitute the contract terms. <u>Treasurer of N.J.</u>, 684 F.3d at 387 (citing <u>Rotman v. United States</u>, 31 Fed. Cl. 724, 725 (1994)). The government has nonetheless moved to dismiss Kansas's complaint for lack of subject matter jurisdiction, arguing that the escheatment proceedings in Kansas state court did not effect a valid transfer of ownership under Treasury regulations with respect to the Absent Bonds. <u>See</u> Def.'s Mot. to Dismiss 7-15. Because Kansas is not the owner of the Absent Bonds, the government reasons, it is not party to the contracts that those bonds represent. <u>Id.</u> Therefore, the government concludes, Kansas's claims cannot be "founded . . . upon any express or implied contract with the United States," as required for this Court to exercise jurisdiction under the Tucker Act, § 1491(a)(1). Def.'s Mot. to Dismiss 7-8.

In the Court's view, the government's argument—that Kansas was not a party to the contract because under Treasury's Regulations it was not the owner of the Absent Bonds—goes to the merits of Kansas's contract claims, not this Court's jurisdiction over them. The Federal Circuit has long held that a well-pleaded allegation that an express or an implied-in-fact contract underlies the plaintiff's claim suffices to confer subject matter jurisdiction in the Court of Federal Claims. <u>Trauma Serv. Grp. v. United States</u>, 104 F.3d 1321, 1325 (Fed. Cir. 1997) (citing <u>Gould, Inc. v. United States</u>, 67 F.3d 925, 929 (Fed. Cir. 1995)). <u>See also</u> <u>Do-Well Mach. Shop, Inc. v. United States</u>, 870 F.2d 637, 639-40 (Fed. Cir. 1989) ("Jurisdiction, therefore, is not defeated . . . by the possibility that the averments might fail to state a cause of action on which petitioners could actually recover." (quoting <u>Bell v. Hood</u>, 327 U.S. 678, 682 (1946))); <u>Moden v. United States</u>, 404 F.3d 1335, 1340 (Fed. Cir. 2005) ("The forum has jurisdiction to hear the matter in the first instance—that is, subject-matter jurisdiction existed—as long as the petitioner asserted nonfrivolous claims" (quoting <u>Spruill v. Merit Sys. Prot. Bd.</u>, 978 F.2d 679, 687-88 (Fed. Cir. 1992))). <u>See also</u> <u>Oswalt v. United States</u>, 41 F. App'x 471, 473 (Fed. Cir. July 12, 2002) (observing that, "[b]ecause plaintiffs alleged contracts with the United States, and resolution of the jurisdictional issue of privity of contract under the Tucker Act is intertwined

---

[6] As the government did in its motion, the Court refers to the following four of Kansas's claims as its contract-based claims: breach of express contract; breach of implied-in-fact contract; breach of fiduciary duties with respect to express contracts; and action for accounting.

with the merits of [plaintiffs'] express and implied breach of contract claims," the Court of Federal Claims should not have dismissed for lack of jurisdiction and should have analyzed the issue as one on the merits).

Here, Kansas's complaint contains a well-pleaded allegation that there is a contract between Kansas and the United States. This allegation, moreover, is not frivolous; indeed, as explained below, Kansas's allegations give rise to a plausible claim for relief. See Twombly, 550 U.S. at 556. Therefore, this Court has subject matter jurisdiction under the Tucker Act to resolve Kansas's contract claims.

**B.      Third-Party Beneficiary Claim**

In moving to dismiss Kansas's third-party beneficiary claim for lack of jurisdiction, the government argues that, as a matter of law, Kansas does not constitute a third-party beneficiary of the savings bond contracts. Def.'s Mot. to Dismiss 16-17. The Court also views this question as going to the merits of Kansas's claim, and not the Court's jurisdiction. Thus, the Court shall address the government's arguments with respect to Kansas's third-party beneficiary claim, like the government's arguments with respect to Kansas's contract claims, in connection with its determination on the merits.

**C.      Equitable Estoppel and Declaratory Judgment Claims**

The government's argument that the Court should dismiss Kansas's equitable estoppel and declaratory judgment claims proceeds as follows: per the Tucker Act, 28 U.S.C. § 1491(a)(2), this Court has jurisdiction over claims for equitable and declaratory relief only when such claims are "an incident of and collateral to" a claim for money damages; the Court must dismiss all of Kansas's claims for money damages either for lack of jurisdiction or for failure to state a claim upon which relief can be granted; thus, the Court also must dismiss Kansas's equitable estoppel and declaratory judgment claims for lack of jurisdiction. Def.'s Mot. to Dismiss 19-20. The government's argument for dismissal of Kansas's equitable estoppel and declaratory judgment claims, therefore, depends upon a dismissal of all of Kansas's other claims. As set forth below, the Court denies the government's motion to dismiss as to Kansas's contract claims and its takings claim. Accordingly, Kansas's claims for equitable estoppel and declaratory judgment remain "an incident of and collateral to" claims for money damages, and the government's motion to dismiss them pursuant to Rule 12(b)(1) must be denied.

**III.     Sufficiency of Kansas's Claims Under RCFC 12(b)(6)**

**A.      Kansas's Contract Claims**

**1.      The Parties' Contentions**

As the basis for its motion to dismiss Kansas's contract claims, the government argues that, under Treasury regulations—and therefore under the savings bond contracts—Treasury was not required to recognize Kansas's claims of ownership of the bonds based on the state

escheatment proceedings.  See Mot. to Dismiss 8, 11.  Thus, the merits of the government's motion to dismiss for failure to state a claim hinge upon the meaning of the regulations.

The pertinent regulatory provisions are contained at Subpart E of 31 C.F.R. Part 315 (captioned "Limitations on Judicial Proceedings").  Entitled "General," 31 C.F.R. § 315.20 states as follows:

> The following general rules apply to the recognition of a judicial determination on adverse claims affecting savings bonds:
>
> (a) The Department of the Treasury will not recognize a judicial determination that gives effect to an attempted voluntary transfer inter vivos of a bond, or a judicial determination that impairs the rights of survivorship conferred by these regulations upon a coowner or beneficiary. All provisions of this Subpart are subject to these restrictions.
>
> (b) The Department of the Treasury will recognize a claim against an owner of a savings bond and conflicting claims of ownership of, or interest in, a bond between coowners or between the registered owner and the beneficiary, if established by valid, judicial proceedings, but only as specifically provided in this subpart. Section 315.23 specifies the evidence required to establish the validity of the judicial proceedings.
>
> (c) The Department of the Treasury and the agencies that issue, reissue, or redeem savings bonds will not accept a notice of an adverse claim or notice of pending judicial proceedings, nor undertake to protect the interests of a litigant not in possession of a savings bond.

Kansas contends that its claim of ownership of the Absent Bonds pursuant to the state court escheat judgment is one that 31 C.F.R. § 315.20(b) requires Treasury to recognize because it is a "claim against an owner of a savings bond" that is "established by valid, judicial proceedings."  Further, Kansas argues, its claim is one "established by valid, judicial proceedings . . . as specifically provided" in Subpart E because the state court judgment satisfies the requirements that 31 C.F.R. § 315.23 (entitled "Evidence") sets forth for establishing the validity of judicial proceedings.  See Pl.'s Resp. 27-28; see also 31 C.F.R. § 315.23(a) ("To establish the validity of judicial proceedings, certified copies of the final judgment, decree, or court order, and of any necessary supplementary proceedings, must be submitted.  If the judgment, decree, or court order was rendered more than six months prior to the presentation of the bond, there must also be submitted a certificate from the clerk of the court, under court seal, dated within six months of the presentation of the bond, showing that the judgment, decree, or court order is in full force.").[7]

---

[7] Subsections 315.23(b) and (c), which are not directly at issue in this case, set forth specific requirements for the recognition of the validity of judicial proceedings in cases involving the payment of the proceeds of a bond to a trustee in bankruptcy or receiver in equity, as follows:

The government, on the other hand, argues that state court escheatment proceedings are not among the "valid, judicial proceedings" to which section 315.20(b) refers.  Def.'s Mot. 12-13.  It focuses on the phrase in that regulation stating that a claim of ownership may be established by valid, judicial proceedings "only as specifically provided in this subpart."  Id.  The government does not deny that Kansas satisfied the evidentiary requirements set forth in 31 C.F.R. § 315.23 to establish the validity of the state court escheatment proceedings upon which its claim of ownership is based.  Rather, it argues that the regulatory phrase providing that Treasury will recognize a claim of ownership established through valid, judicial proceedings "but only as provided in this subpart" means that Treasury will only recognize the specific categories of judgments that are referenced elsewhere in Subpart E—i.e., the judgments referenced in § 315.21, entitled "[p]ayment to judgment creditors,"[8] and those identified in § 315.22, entitled "[p]ayment or reissue pursuant to judgment."[9]  According to the government,

---

  (b) Trustee in bankruptcy or receiver of an insolvent's estate. A request for payment by a trustee in bankruptcy or a receiver of an insolvent's estate must be supported by appropriate evidence of appointment and qualification. The evidence must be certified by the clerk of the court, under court seal, as being in full force on a date that is not more than six months prior to the presentation of the bond.

  (c) Receiver in equity or similar court officer. A request for payment by the receiver in equity or a similar court officer, other than a receiver of an insolvent's estate, must be supported by a copy of an order that authorizes the presentation of the bond for redemption, certified by the clerk of the court, under court seal, as being in full force on a date that is not more than six months prior to the presentation of the bond.

[8] Section 315.21 states as follows:

  (a) Purchaser or officer under levy. The Department of the Treasury will pay (but not reissue) a savings bond to the purchaser at a sale under a levy or to the officer authorized under appropriate process to levy upon property of the registered owner or coowner to satisfy a money judgment. Payment will be made only to the extent necessary to satisfy the money judgment. The amount paid is limited to the redemption value 60 days after the termination of the judicial proceedings. Payment of a bond registered in coownership form pursuant to a judgment or a levy against only one coowner is limited to the extent of that coowner's interest in the bond. That interest must be established by an agreement between the coowners or by a judgment, decree, or order of a court in a proceeding to which both coowners are parties.

  (b) Trustee in bankruptcy, receiver, or similar court officer. The Department of the Treasury will pay, at current redemption value, a savings bond to a trustee in bankruptcy, a receiver of an insolvent's estate, a receiver in equity, or a similar court officer under the provisions of paragraph (a) of this section.

[9] Section 315.22 states as follows:

"exceptions to § 315.5(a) [the rule stating that registration is conclusive of ownership] by judicial proceedings include claims of ownership based on a divorce decree (§ 315.22(a)) and claims based on a gift causa mortis (§ 315.22(b))" but not claims of ownership arising out of an escheatment judgment because "escheatment actions are not one of the 'valid judicial proceedings' recognized in the regulations." Def.'s Mot. to Dismiss 12.

Thus, Kansas interprets the phrase "valid, judicial proceedings" in § 315.20(b) as a catchall category, subject only to the exceptions identified in § 315.20(a) (for judicial determinations that "give[] effect to an attempted voluntary transfer inter vivos of a bond," or that "impair[] the rights of survivorship conferred by [the] regulations upon a coowner or beneficiary"). Its argument is that the phrase "as specifically provided in this subpart" in § 315.20(b) was not intended to limit the types of judicial proceedings that could confer bond ownership rights but instead refers to the manner in which the validity of judicial proceedings must be established. The government, on the other hand, asserts that the otherwise broad term "valid, judicial proceedings" is narrowed by the "specifically provided" language, with the result

---

(a) Divorce. The Department of the Treasury will recognize a divorce decree that ratifies or confirms a property settlement agreement disposing of bonds or that otherwise settles the interests of the parties in a bond. Reissue of a savings bond may be made to eliminate the name of one spouse as owner, coowner, or beneficiary, or to substitute the name of one spouse for that of the other spouse as owner, coowner, or beneficiary pursuant to the decree. However, if the bond is registered in the name of one spouse with another person as coowner, there must be submitted either:

(1) A request for reissue by the other person or

(2) A certified copy of a judgment, decree, or court order entered in proceedings to which the other person and the spouse named on the bond are parties, determining the extent of the interest of that spouse in the bond.

Reissue will be permitted only to the extent of that spouse's interest. The evidence required under § 315.23 must be submitted in every case. When the divorce decree does not set out the terms of the property settlement agreement, a certified copy of the agreement must be submitted. Payment, rather than reissue, will be made if requested.

(b) Gift causa mortis. A savings bond belonging solely to one individual will be paid or reissued at the request of the person found by a court to be entitled by reason of a gift causa mortis from the sole owner.

(c) Date for determining rights. When payment or reissue under this section is to be made, the rights of the parties will be those existing under the regulations current at the time of the entry of the final judgment, decree, or court order.

that only those claims of ownership that arise out of the types of judicial proceedings explicitly referenced in Subpart E must be recognized.[10]

For the reasons set forth in greater detail below, the Court concludes that Kansas's reading of the regulatory text is the more persuasive one. By contrast, the government's position is inconsistent with the position that Treasury has articulated for over sixty years through interpretive guidance, statements on its website, and positions taken in litigation as recently as April of 2013, just one month before Kansas requested payment on the bonds in this case. Accordingly, the Court concludes that Kansas has stated a claim for relief with respect to its allegations of breach of contract.

## 2.      The Regulatory Text

To determine the meaning of the regulations, the Court begins with their text. <u>See</u> <u>Chase Bank USA, N.A. v. McCoy</u>, 562 U.S. 195, 204 (2011). As noted, 31 C.F.R. § 315.20(b) states that Treasury "will recognize a claim against an owner of a savings bond . . . if established by valid, judicial proceedings, but only as specifically provided in this subpart." Subsection (a) of § 315.20, in turn, identifies the specific judicial determinations that Treasury will not recognize (those that give effect to "an attempted voluntary transfer inter vivos of a bond" and those that "impair[] the rights of survivorship conferred by these regulations upon a coowner or beneficiary").

In the Court's view, the best reading of the phrase "but only as specifically provided in this subpart" is that it was intended to: (1) preclude the recognition of claims of ownership where the evidentiary requirements set forth in Subpart E for establishing the validity of judicial proceedings (§ 315.23) have not been met; and (2) reference the particular requirements, limitations and/or conditions that Subpart E imposes on the redemption or reissuance of bonds in the context of the particular types of judicial proceedings that are governed by §§ 315.21 and 315.22.

Thus, there are essentially two ways to read the phrase "but only as specifically provided in this subpart." Kansas argues that the word "as" in this context means "in the manner of."

---

[10]  In its first supplemental brief, the government raised for the first time two new bases for refusing to recognize ownership rights arising out of state court escheatment proceedings: (1) that such proceedings do not involve a claim against the owner, coowner, or beneficiary of a savings bond, as required under subsection 315.20(b), because an escheat judgment involves a proceeding that is brought against the property itself (in rem), and (2) that "[t]o the extent that Kansas claims title over savings bonds with a co-owner or beneficiary," such a claim would be inconsistent with the language of § 315.20(a) "because it would interfere with the rights of survivorship conferred by Treasury regulations." Def.'s 1st Supp. Br. 4-5. The Court addresses these arguments in subsection 3 below, which concerns the apparent inconsistency of the positions the government has taken both historically and in this matter concerning whether rights of ownership based on title-based escheatment statutes must be recognized under Treasury's regulations.

Pl.'s 1st Supp. Br. 12-13, Feb. 16, 2015, ECF No. 29.  It contends that "used in the phrase 'as specifically provided' the word 'as' describes the manner in which Treasury should determine the validity of a judicial proceeding, not whether it will recognize a particular proceeding."  Id. at 13.  On the other hand, under the government's argument, the word "as" means "to the extent" or "if"—i.e. that Treasury will recognize claims based on valid, judicial proceedings only to the extent that, or if, such recognition is specifically provided for in Subpart E.

The problem with reading the word "as" in the manner the government would read it (to mean "if") is that the result would be a construction of the regulations that collides with the well-established canon of interpretation that holds that regulatory text should not be read in such a way as to render any portion of the language superfluous.  See Glover v. West, 185 F.3d 1328, 1332 (Fed. Cir. 1999) ("[W]e attempt to give full effect to all words contained within [a] statute or regulation, thereby rendering superfluous as little of the statutory or regulatory language as possible.").  For if the government is correct that only those categories of judgments specifically referenced in §§ 315.21 and 315.22 are entitled to recognition, then the exceptions set forth in subsection (a) of § 315.20 to the general rule recognizing claims established pursuant to valid, judicial proceedings would be unnecessary.

Moreover, the government's reading of the effect of §§ 315.21 and 315.22 (which posits that those sections contain an exhaustive enumeration of the particular types of judicial proceedings that can confer ownership rights) ignores what appears to be their actual purpose: to address specific considerations and concerns attendant to the types of judgments referenced in those sections.  Thus, section 315.21(a) places limitations on the extent to which Treasury will recognize claims of bond purchasers at a sale under levy or to an officer authorized to levy upon the property of an owner to satisfy a money judgment, specifying, for example, that "[p]ayment will be made only to the extent necessary to satisfy the money judgment" and that "[t]he amount paid is limited to the redemption value 60 days after the termination of the judicial proceedings."  And § 315.21(b) specifies that, in contrast, Treasury will pay the proceeds of the bond to a trustee in bankruptcy, receiver in equity, or similar court officer "at current redemption value," but does not authorize the reissuance of the bonds in such circumstances.

Similarly, § 315.22(a) concerns recognition of a divorce decree ratifying a property settlement that disposes of savings bonds or otherwise settles each spouse's interest in such bonds.  It prescribes specific rules for the reissuance of a bond in that particular context.  Section 315.22(a) also serves the purpose of clarifying that such a decree would not fall within the language of § 315.20(a), which states that Treasury will not recognize a judicial determination that gives effect to "an attempted voluntary transfer inter vivos of a bond."  And § 315.22(b) specifies that Treasury will—upon request—either pay or reissue a savings bond to a person found by a court to be entitled to such bond as the result of a gift causa mortis.

For these reasons, the Court concludes that Kansas's reading of the scope of the phrase "valid, judicial proceedings" contained in the regulations—which includes state court escheatment proceedings whose validity is established in accordance with section 315.23—is more persuasive than the government's.  The Court now turns to the question of whether, notwithstanding this conclusion, it owes deference to Treasury's interpretation of its regulations,

as set forth in this litigation and in its October 2013 letter denying Kansas's request for payment on the Absent Bonds.

### 3.    Previous Administrative Interpretation of the Regulations

It is well established that an agency's interpretation of its own regulations is "controlling unless 'plainly erroneous or inconsistent with the regulation.'" Auer v. Robbins, 519 U.S. 452, 461 (1997) (quoting Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 359 (1989) (quoting Bowles v. Seminole Rock & Sand Co., 325 U.S. 410, 414 (1945))). "[T]his general rule," however, "does not apply in all cases." Christopher v. SmithKline Beecham Corp., 132 S. Ct. 2156, 2166 (2012). Thus, deference is "unwarranted" where "there is reason to suspect that the agency's interpretation 'does not reflect the agency's fair and considered judgment on the matter in question.'" Christopher, 132 S. Ct. at 2166 (quoting Auer, 519 U.S. at 462). The Supreme Court has withheld deference on this basis, for instance, "when the agency's interpretation conflicts with a prior interpretation," id. (citing Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 515 (1994)); "when it appears that the interpretation is nothing more than a 'convenient litigating position,'" id. (quoting Bowen v. Georgetown Hosp., 488 U.S. 204, 213 (1988)); or when it appears that the interpretation is a "'post hoc rationalizatio[n]' advanced by an agency seeking to defend past agency action against attack," id (quoting Auer, 519 U.S. at 462).

Here, the Court does not believe that the government's interpretation is "plainly erroneous or inconsistent with the regulation." Auer, 519 U.S. at 461. There are ample reasons to find, however, that the interpretation being proffered in this case "does not reflect the agency's fair and considered judgment on the matter in question.'" Christopher, 132 S. Ct. at 2166. Foremost among these is the fact that the government's "interpretation conflicts with [Treasury's] prior interpretation" of its regulations. Id. (citing Thomas Jefferson Univ., 512 U.S. at 515). Indeed, this conflict, in conjunction with other inconsistencies within the arguments the government has made in this litigation, convinces the Court that the position being advanced in this case is merely a post-hoc rationalization for Treasury's decision not to honor the Kansas state court judgment as to the Absent Bonds.

Thus, as described above, in the Escheat Decision, issued in 1952, Treasury rejected the State of New York's request to redeem bonds it held pursuant to its custodial escheatment statute. The Secretary explained that the critical criterion for granting such a request by a state was that it possess legitimate ownership of a bond. He noted that "even where no explicit reference is made in the regulations to a particular case, the Department will pay one who succeeds to the title of the bondholder" and that "[t]his is not regarded as a violation of the agreement, but, on the contrary, as payment to the bondholder in the person of his successor or representative." Pl.'s Resp. App. 283 (emphasis in original). "Thus," the Secretary observed, "although the regulations do not mention such a case, the Department recognizes the title of the state when it makes claim based upon a judgment of escheat." Id.

Treasury reiterated this view in 1983, in a letter to the Secretary of Revenue of the State of Kentucky. It stated that "[b]asically, the Department's position is that claims by States for payment of United States securities will be recognized only where the States have actually

succeeded to the title and ownership of the securities pursuant to valid escheat proceedings." Id. App. 285.

This exact statement also had appeared on Treasury's web site from 2000 until very recently.[11]  Id. App. 290.  Moreover, the government recently restated and relied on this position and interpretation of its regulations in litigation, including in briefs filed with the Third Circuit and the Supreme Court in which the government expressly characterized the position as representing Treasury's "considered interpretation of federal law."  See, e.g., id. App. 9.

In the Treasurer of New Jersey case, six states (New Jersey, Montana, Kentucky, Oklahoma, Missouri, and Pennsylvania) sought payment on savings bonds pursuant to their custody-based escheatment statutes.  In that case, the government told both the Third Circuit and the Supreme Court that title-based escheatment constitutes a "valid, judicial proceeding" within the meaning of its regulations.  Further, in explaining its position, it made no mention of the "as specifically provided in this subpart" proviso or of its regulations at § 315.21 or § 315.22.

Thus, in its brief in the United States Court of Appeals for the Third Circuit, the government observed that "Treasury regulations generally provide that payment on a U.S. savings bond will be made only to the registered owner" but that "[t]he regulations specify limited exceptions to this rule, including cases in which a third party obtains ownership of the bond through valid judicial proceedings."  Brief for Appellees at 6, Treasurer of N.J. v. U.S. Dep't of Treasury, 684 F.3d 382 (3d Cir. 2012) (No. 10-1963), 2011 WL 6935510 (citing 31 C.F.R. §§ 315.20(b), 315.23, 353.20(b), 353.23).  Significantly, it further explained that "[a] State may satisfy this ownership requirement 'through escheat, a procedure with ancient origins whereby a sovereign may acquire title to abandoned property if after a number of years no rightful owner appears.'"  Id. (emphasis added) (quoting Texas v. New Jersey, 379 U.S. 674,675 (1965)).  The Third Circuit agreed with Treasury and ruled against the states, explaining that this "result does not nullify state escheat laws for, as provided in the federal regulations and as recognized by the Treasury, third parties, including the States, may obtain ownership of the bonds—and consequently the right to redemption—through "valid[ ] judicial proceedings." Treasurer of N.J., 684 F.3d at 412 (citing 31 C.F.R. § 315.20(b)).

The states then filed a petition for certiorari in the case.  Then, as described above, the government's brief in opposition citing only 31 C.F.R. §§ 315.20(b), 315.23, and 353.23 (and not mentioning § 315.21 or § 315.22 at all) explained that it "has long advised the States that to receive payment on a U.S. savings bond a State must complete an escheat proceeding that satisfies due process and that awards title to the bond to the State," and that this "represents the Department's considered interpretation of federal law."  Pl.'s Resp. App. 9 (Brief for the

---

[11] The statement appeared on Treasury's EE/E Savings Bonds FAQs web page, a screen shot of which appears at Pl.'s Resp. App. 289-90.  At some point during this litigation, however, Treasury revised this page, and it now omits any mention of escheatment.  See https://www.treasurydirect.gov/indiv/research/indepth/ebonds/res_e_bonds_eefaq.htm (last visited Aug. 20, 2015).

Respondents in Opposition, Dir. of Dep't of Revenue of Montana v. U.S. Dep't of Treasury, cert. denied, 133 S. Ct. 2735 (2013)).

Despite these unambiguous statements, Treasury claims that it never actually took the position that its regulations required it to recognize claims of ownership pursuant to an escheat judgment. See, e.g., Def.'s Reply 5 (calling the argument that Treasury had stated many times in the past that it would recognize title-based escheatment judgments a "misapprehension of Treasury's past statements"). It attempts to reconcile its position in this litigation with its past statements on the grounds that because those statements "were made in the context of states claiming title for bonds in their possession," they "pertain[ed] only to the effect of state escheatment laws on bonds the state has in its possession." Def.'s Mot. 13 (emphasis in original).

This contention is unpersuasive. First, as Kansas points out, the first paragraph in the Second Amended Complaint in the Treasurer of New Jersey case clearly states that the unclaimed bonds at issue in that matter were "in the hands of missing owners" and not the states. Pl.'s 1st Supp. Br. Add. 2. Second, and in any event, even though Treasury had proffered its interpretation of its regulations in the context of cases in which States were seeking redemption of bonds in their possession, the rationale Treasury offered for its position—that under the regulations, "to receive payment on a U.S. savings bond a State must complete an escheat proceeding that satisfies due process and that awards title to the bond to the State"—is not limited to circumstances in which a State has the bonds in its possession. To the contrary, that rationale was based on the understanding that a judgment pursuant to a title-based escheat statute would serve for purposes of Treasury regulations as a "claim against an owner of a savings bond" that Treasury would recognize, if "established by valid, judicial proceedings." 31 C.F.R. § 315.20(b).

In that regard, the Court is also not persuaded by Treasury's argument that possession of the bonds is uniformly a prerequisite to their redemption under the regulations. Def.'s Mot. to Dismiss 14 (citing 31 U.S.C. § 3105(b)(2)) (asserting that "Treasury regulations require presentation and surrender of the bonds as a prerequisite for payment" and that "[p]hysical surrender ensures that Treasury can close out the bond contract, ensures that the bonds are legitimate, and prevents double payment on the same bond"). To begin with, the regulations explicitly provide for the circumstance in which an owner does not possess the bond, such as when a bond has been lost, stolen, or destroyed. See 31 C.F.R. § 315.25. In such a case, Treasury "may require a bond of indemnity, in the form, and with the surety, or security . . . necessary to protect the interests of the United States." Id. In addition, the regulations provide that a lost, stolen or destroyed bond "for which relief has been granted" (i.e., which has been paid) "is the property of the United States and, if recovered, must be promptly submitted to the Bureau of Fiscal Service . . . for cancellation." 31 C.F.R. § 315.28(b).

In addition, nothing in 31 C.F.R. § 315.20 states that possession is required where a claim of ownership is established pursuant to valid, judicial proceedings. To the contrary, the only reference to a possession requirement that is made in § 315.20 is in subsection (c), which specifies that the government will not accept a notice of an adverse claim or of pending judicial proceedings, "nor undertake to protect the interests of a litigant not in possession of a savings

bond." 31 C.F.R. § 315.20(c).  This section addresses how Treasury will deal with unadjudicated claims of ownership.  Subsection (b), on the other hand, concerns recognition of claims of ownership that are no longer in litigation but that have been established pursuant to valid, judicial proceedings.

Moreover, as the government explained in the Supreme Court brief, the regulatory prohibition on payment to anyone other than the lawful owner is what prevents double payment on the same bond, not a requirement of physical surrender.  Pl.'s Resp. App. 9.  See also id. App. 285 (stating in the 1983 letter that payment to a state that has succeeded to the legal ownership of the savings bonds "results in the full discharge of the Treasury's obligation").  If Treasury recognizes that title to a bond transfers from the original registrant to the state, and if it only honors claims for redemption of that bond by one who holds title to it, there is no chance that the government would incur multiple obligations on a single bond.

Finally, the position that Treasury is taking in this litigation is internally inconsistent.  Thus, it has claimed for the first time in the briefing of its motion to dismiss that its decision to allow Kansas to redeem the Bonds in Possession was based on an exercise of its waiver authority" under § 315.90(a) of the regulations,[12] rather than the rationale expressed in its Escheat Decision and in the briefs that it filed in the Treasurer of New Jersey litigation.  Def.'s Reply 7.  But the letter in which Treasury instructed Kansas on how to proceed in redeeming the Bonds in Possession said nothing to indicate that Treasury was exercising any waiver authority.  See Pl.'s Resp. App. 276-77.  To the contrary, Treasury noted that it would redeem the bonds "in the normal course," after it received a certified copy of the Judgment of Escheatment and other documentation.  Id. at 277.

Treasury's explanation of the basis for its denial of Kansas's request with respect to the Absent Bonds has also continued to morph throughout this case.  In its October 2013 denial letter (and in its initial motion to dismiss), Treasury relied upon its newly articulated narrow interpretation of the "valid, judicial proceedings" language in § 315.20(b).  But in its first supplemental brief, the government argues for the first time that an escheat judgment does not involve "a claim against an owner of a savings bond" within the meaning of § 315.20(b) because an escheat proceeding was not against the owner of the bond; it is an in rem proceeding against the property itself.  Def.'s 1st Supp. Br. 5, Jan. 15, 2015, ECF No. 28.  This post-hoc rationale is

---

[12] 31 C.F.R. § 315.90(a) provides that:

The Commissioner of the Fiscal Service, as designee of the Secretary of the Treasury, may waive or modify any provision or provisions of these regulations. He may do so in any particular case or class of cases for the convenience of the United States or in order to relieve any person or persons of unnecessary hardship:

(a) If such action would not be inconsistent with law or equity, (b) if it does not impair any existing rights, and (c) if he is satisfied that such action would not subject the United States to any substantial expense or liability.

contrary to the position Treasury has taken in the past and also lacks merit.  While an escheatment judgment is obtained by a proceeding "in rem" (i.e., against the property) the result of such a judgment is the substitution of the state for the bond's lawful owner.  Thus, an escheat proceeding may readily be treated as "a claim against the owner of the bond" for purposes of the Treasury regulations.  Indeed, as described above, it has been so treated (at least implicitly) in Treasury's prior statements on the issue.

Treasury further argues (again for the first time in its supplemental brief and again contrary to its historically expressed views) that to the extent that Kansas claims title to savings bonds for which there exists a coowner or beneficiary, such claims would be inconsistent with 31 C.F.R. § 315.20(a), which provides that Treasury will not recognize "a judicial determination that impairs the rights of survivorship conferred by these regulations upon a coowner or beneficiary."  Def.'s 1st Supp. Br. 4.  This argument is unpersuasive because once a determination is made through an escheatment proceeding that the former owner has abandoned the bond, the State becomes its lawful owner.  Therefore, the former coowner or beneficiary no longer has any rights of survivorship to be impaired.

In short, Treasury's litigating position cannot be reconciled with its prior statements expressing what it then characterized as its "considered interpretation" of its regulations.  Pl.'s Resp. App. 9.  And while an agency is certainly entitled to change its interpretation of its own regulations (see Perez v. Mortg. Bankers Ass'n, 135 S. Ct. 1199, 1207 (2015)), the Court cannot conclude that the new position represents the agency's considered judgment, where Treasury resists acknowledging that its position has changed, and where the rationale for its position continues to shift as the litigation itself progresses.  Therefore, the Court concludes that the interpretation of its regulations that is set forth in Treasury's briefs in this case is entitled to no deference at all.  If anything, deference is due to the interpretation that Treasury expressed for over sixty years until the instant controversy arose.  Accordingly, and for the reasons set forth above in Part III.A.2, the Court concludes that Kansas's interpretation of the relevant Treasury regulations is correct and that it has stated a claim for relief with respect to its allegations of breach of contract.[13]

---

[13] On June 30, 2015, the government filed a notice with the Court advising it that on June 26, 2015, Treasury had issued a Notice of Proposed Rulemaking.  The proposed regulation adds a new subpart O, which requires states seeking to redeem bonds to possess the bonds for which they claim title and to produce evidence that the bonds have been abandoned by all persons entitled to payment.  80 Fed. Reg. 37,559-01 (proposed July 1, 2015) (to be codified at 31 C.F.R. § 315.88).  The government appears to argue that this Notice has some bearing on the issues before the Court in this case; it observes that "[w]hen evaluating the issue of deference, a court may consider an interpretation formally promulgated in a rulemaking after the controversy or litigation arose."  Def.'s Notice of Proposed Rulemaking 2, ECF No. 36 (citing Smiley v. Citibank, 517 U.S. 735, 741 (1996) and Motorola, Inc. v. United States, 436 F.3d 1357, 1366 (Fed. Cir. 2006)).  But the Federal Register Notice does not purport to interpret existing regulations (or a statute, as in Smiley and Motorola); its purpose is to change those regulations to reflect the position that the government is taking in this case.  The Court, therefore, does not

## B.        Third-Party Beneficiary Claim

The Court turns next to Kansas's third-party beneficiary claim, which the government has moved to dismiss for lack of jurisdiction but which, as noted above, the Court tests for its sufficiency to state a claim upon which relief can be granted.  With respect to this claim, Kansas alleges in its complaint that the Treasury regulations "demonstrate the intent of the parties to [the savings bond] contracts to provide a means of transferring ownership of U.S. savings bonds" and provide that valid, judicial proceedings are one means of transferring such ownership.  Compl. ¶ 127.  Thus, Kansas alleges, "Kansas falls within the class clearly intended to benefit from the U.S. savings bond contracts because it is an owner of U.S. savings bonds and it has established its ownership of the contracts by valid judicial proceedings."  Compl. ¶ 128.  According to Kansas, these allegations demonstrate that "the State of Kansas is a third-party beneficiary to the subject U.S. savings bond contracts."  Id.

The Court agrees with the government that the facts that Kansas has alleged do not support a claim of third-party beneficiary status.  A third-party beneficiary is not a party to the contract but rather is one on whom the contracting parties intend that the contract will confer a direct benefit.  Glass v. United States, 258 F.3d 1349, 1354 (Fed. Cir. 2001) (citing German Alliance Ins. Co. v. Home Water Supply Co., 226 U.S. 220, 230 (1912)).  As discussed above, Kansas has adequately alleged that it has become a party to the savings bonds contracts, but nothing in its complaint suggests, in contrast, that Treasury and the registered owners of the bonds entered contracts with the intention of benefitting Kansas.  Therefore, the government's motion to dismiss is granted with respect to Kansas's third-party beneficiary claim.

## C.        Fifth Amendment Takings Claim

The final issue that the government raises in its motion is the sufficiency of Kansas's claim that the government's refusal to allow redemption of the Absent Bonds constituted a taking without just compensation under the Fifth Amendment.  In addition to repeating the argument rejected above, that Kansas has not gained ownership of the bonds in accordance with Treasury regulations, the government contends that Treasury's actions in relation to the savings bonds contracts were proprietary, and therefore, Kansas's claim, asserted as a Fifth Amendment taking, is better treated as one for breach of contract.  Def.'s Mot. 19 (citing Hughes Commc'ns Galaxy, Inc. v. United States, 271 F.3d 1060, 1070 (Fed. Cir. 2001)).

It is well established that "[c]ontract rights are a form of property and as such may be taken for a public purpose provided that just compensation is paid."  U.S. Trust Co. of N.Y. v. New Jersey, 431 U.S. 1, 19 n.16 (1977) (citing Contributors to Pa. Hosp. v. Philadelphia, 245 U.S. 20, 23 (1917)).  See also A&D Auto Sales, Inc. v. United States, 748 F.3d 1142, 1152 (Fed. Cir. 2014).  As the government argues in its motion, however, the Federal Circuit has observed that "[t]aking claims rarely arise under government contracts because the Government acts in its commercial or proprietary capacity in entering contracts, rather than in its sovereign capacity."

consider the Notice relevant in any way to the proper interpretation of the existing regulations at issue in this case.

Hughes Commc'ns Galaxy, 271 F.3d at 1070.  "Proprietary government action typically involves bargaining with private actors for the provision or procurement of goods and services; the action is deemed proprietary even though the government may enter into the contractual relationship in pursuit of a larger governmental objective." A&D Auto Sales, 748 F.3d at 1156.  In such cases, the court of appeals continued, "remedies arise from the contracts themselves, rather than from the constitutional protection of private property rights." Hughes Commc'ns Galaxy, 271 F.3d at 1070.

The Federal Circuit clarified this observation, however, in Stockton East Water District v. United States, 583 F.3d 1344 (Fed. Cir. 2009).  Specifically, the court explained that its statements in Hughes "cannot be understood as precluding a party from alleging in the same complaint two alternative theories for recovery against the Government, for example, one for breach of contract and one for a taking under the Fifth Amendment to the Constitution." Stockton, 583 F.3d at 1368. "On the other hand," the court further explained,

> it can be understood to mean that, when a case arises in which both a contract and a taking cause of action are pled, the trial court may properly defer the taking issue, as it did here, in favor of first addressing the contract issue.  It has long been the policy of the courts to decide cases on non-constitutional grounds when that is available, rather than reach out for the constitutional issue.  See Nw. Austin Mun. Util. Dist. No. One v. Holder, [557 U.S. 193, 205] (2009).  And of course when a plaintiff is awarded recovery for the alleged wrong under one theory, there is no reason to address the other theories.

Stockton, 583 F.3d at 1368.

Here, the Court takes instruction from Stockton and finds that dismissal of Kansas's claim under the Takings Clause is inappropriate at this stage.  Thus, the government's motion to dismiss is denied as to this claim.

## CONCLUSION

Based on the foregoing, the Court rules on the government's motion to dismiss as follows:

1. The government's motion to dismiss Kansas's contract-based claims for lack of subject-matter jurisdiction pursuant to RCFC 12(b)(1) is **DENIED**.

2. The government's motion to dismiss Kansas's claims for equitable estoppel and declaratory judgment for lack of subject-matter jurisdiction pursuant to RCFC 12(b)(1) is **DENIED**.

3. The government's motion to dismiss Kansas's third-party beneficiary claim, construed as a motion for failure to state a claim upon which relief can be granted pursuant to RCFC 12(b)(6), is **GRANTED**.

4.  The government's motion to dismiss Kansas's claim under the Takings Clause of the Fifth Amendment for failure to state a claim upon which relief can be granted pursuant to RCFC 12(b)(6) is **DENIED**.

**IT IS SO ORDERED.**

s/ Elaine D. Kaplan
ELAINE D. KAPLAN
Judge