# In the United States Court of Federal Claims

No. 13-1011C
(Filed: August 8, 2017)

|  |  |
|---|---|
| JAKE LATURNER, Treasurer of the State of Kansas, <br><br> Plaintiff, <br><br> v. <br><br> THE UNITED STATES OF AMERICA, <br><br> Defendant. | Keywords: Summary Judgment; Breach of Contract; U.S. Savings Bonds; Preemption; Intergovernmental Immunity; Due Process Clause of the Fourteenth Amendment; Breach of Contract; 31 C.F.R. § 315.20(b). |

*J. Brett Milbourn*, Walters Bender Strohbehn & Vaughn, P.C., Kansas City, MO, with whom was *David C. Frederick*, Kellogg, Huber, Hansen, Todd, Figel, & Frederick, P.L.L.C., Washington, DC, for Plaintiff.

*Eric P. Bruskin*, Senior Trial Counsel, Civil Division, U.S. Department of Justice, Washington, DC, with whom were *Steven J. Gillingham*, Assistant Director, *Robert E. Kirschman, Jr.*, Director, and *Chad A. Readler*, Acting Assistant Attorney General, for Defendant. *Theodore C. Simms, II*, Senior Counsel, U.S. Department of the Treasury, and *Albert S. Iarossi*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Of Counsel.

## OPINION AND ORDER

**KAPLAN, Judge.**

In this breach-of-contract case, Plaintiff Jake LaTurner, Treasurer of the State of Kansas (Kansas) claims that Kansas has obtained title under the state's Disposition of Unclaimed Property Act (Unclaimed Property Act) to a large but unknown number of matured, unredeemed United States savings bonds, and that the federal government has wrongfully failed to redeem those bonds. The bonds, issued by the United States Department of the Treasury (Treasury), carry thirty- or forty-year maturity periods. Although Kansas claims that it owns the bonds, it does not possess the bond certificates that Treasury issued when the bonds were purchased. Nevertheless, pursuant to a state court judgment of escheat, Kansas contends that it has obtained title to all unredeemed bonds whose holders' last known addresses, as shown on Treasury's records, are in the state. These bonds are known as the "absent bonds."

Kansas has moved for partial summary judgment as to the government's liability for failing to redeem the bonds or to provide Kansas with identifying information about them. The government has also moved for summary judgment on all of Kansas's claims. It contends that, for several reasons, Treasury did not breach the savings bond contracts when it refused to redeem the absent bonds. Among other things, it claims that Treasury's savings bond regulations do not permit transfers of ownership under the Unclaimed Property Act, and that Kansas's lack of possession of the bond certificates is fatal to its claims; that the Unclaimed Property Act runs afoul of principles of federal supremacy; and that the state court judgment of escheat was constitutionally infirm.

For the reasons discussed below, the Court concludes that the government's arguments lack merit, and that the undisputed facts entitle Kansas to summary judgment with respect to its ownership of the absent bonds and the government's liability. Accordingly, the government's motion for summary judgment is **DENIED**, and Kansas's motion for partial summary judgment is **GRANTED**.

## BACKGROUND

I.      **The United States Savings Bond Program and Implementing Regulations**

A.      <u>**Overview**</u>

In the exercise of its power to "borrow Money on the credit of the United States," U.S. Const. art. I, § 8, cl. 2, Congress has authorized Treasury to "issue savings bonds and savings certificates," the proceeds of which "shall be used for expenditures authorized by law," 31 U.S.C. § 3105(a); <u>see also</u> <u>Free v. Bland</u>, 369 U.S. 663, 666–67 (1962). Over the years, Treasury has issued such bonds in various Series, each designated by a letter of the alphabet. <u>See, e.g.</u>, 31 C.F.R. Part 315 (regulations governing Series A, B, C, D, E, F, G, H, J, and K bonds). Treasury issued the bonds in paper form until 2012, when it switched to an all-electronic system. <u>See</u> <u>Treasury Looks Back at 76 Years of Paper U.S. Savings Bonds As Move to Online Savings Bonds to Save Taxpayers $120 Million</u>, TreasuryDirect.gov (Dec. 27, 2011), https://www.treasurydirect.gov/news/ pressroom/pressroom_comotcend1211.htm.

"It is well established that savings bonds are contracts between the United States and the owners of the bonds . . . ." <u>Estes v. United States</u>, 123 Fed. Cl. 74, 81 (2015) (citing <u>Treasurer of N.J. v. U.S. Dep't of the Treasury</u>, 684 F.3d 382, 387 (3d Cir. 2012) and <u>Rotman v. United States</u>, 31 Fed. Cl. 724, 725 (1994)). The contracts' terms are set forth in Treasury's savings bond regulations, found in Part 315 of Title 31 of the Code of Federal Regulations. <u>See id.</u> As discussed below, the regulations prescribe (among other things) "the form and amount of an issue and series"; "the way in which [the savings bonds] will be issued"; "the conditions, including restrictions on transfer, to which they will be subject"; and "conditions governing their redemption." 31 U.S.C. § 3105(c)(1)– (4).

As noted, the bonds typically carry long maturity periods—often thirty or forty years. <u>See</u> <u>The History of U.S. Savings Bonds</u>, TreasuryDirect.gov, https://www.treasury

direct.gov/timeline.htm?src=td&med=banner&loc=consumer (last visited August 4, 2017). Treasury issued millions of savings bonds between the 1940s and the 1970s. See id. Although most of the matured bonds have been redeemed, millions remain unredeemed. See See Savings Bonds and Notes (SBN) Tables and Downloadable Files, TreasuryDirect.gov, https://www.treasurydirect.gov/govt/reports/pd/pd_sbntables_ downloadable_files.htm (last updated Apr. 27, 2012). As of March 2012, the value of such matured, unredeemed savings bonds was approximately $16 billion. See id.

### B.    Issuance and Registration

Under Treasury's regulations, "[s]avings bonds are issued only in registered form." 31 C.F.R. § 315.5(a) (2014).[1] This means that "the names of all persons named on the bond and the taxpayer identification number (TIN) of the owner, first-named coowner, or purchaser of a gift bond are maintained on [Treasury's] records." Id. § 315.2(n). According to the regulations, "[r]egistration is conclusive of ownership." Id. § 315.5(a). Thus, registration "express[es] the actual ownership of, and interest in, the bond." Id.

### C.    Restrictions on Transfer

The regulations contain numerous conditions restricting the transfer of savings bonds and inhibiting third-party attempts to assert rights against them. First, § 315.15 establishes that bonds "are not transferable and are payable only to the owners named on the bonds, except as specifically provided in these regulations and then only in the manner and to the extent so provided." Id.

Next, subsections 315.20–.23 set forth "limitations on judicial proceedings" applicable to "adverse claims affecting savings bonds."[2] Id. § 315.20. In particular, § 315.20(b) provides that Treasury "will recognize a claim against an owner of a savings bond . . . if established by valid, judicial proceedings, but only as specifically provided in this subpart." In that regard, § 315.20(a) specifies that Treasury "will not recognize a judicial determination that gives effect to an attempted voluntary transfer inter vivos of a bond, or a judicial determination that impairs the rights of survivorship conferred by these regulations upon a coowner or beneficiary." Id. Further, § 315.23(a) instructs that "[t]o establish the validity of judicial proceedings," a claimant must submit "certified copies of the final judgment, decree, or court order, and of any necessary supplementary proceedings."

Before 2015, the regulations did not expressly mention state court judgments of escheat of the type at issue in this case. See Estes, 123 Fed. Cl. at 83–86 (analyzing the regulations); see also id. at 90 n.13 (noting that Treasury had proposed revised

---

[1] Unless otherwise noted, all references to Treasury's savings bond regulations are to the regulations in effect on December 20, 2013, the date Kansas filed its complaint.

[2] These four subsections form Subpart E of the regulations.

regulations expressly tailored to state court escheat judgments); <u>Regulations Governing United States Savings Bonds</u>, 80 Fed. Reg. 80,258-01 (Dec. 24, 2015) (codified at 31 C.F.R. pts. 315, 353, 360) (final rule promulgating the revised regulations).

**D.    Redemption and Relief for Lost, Stolen, Destroyed, or Mutilated Bonds**

The regulations specify that, as a general matter, "[p]ayment of a savings bond will be made to the person or persons entitled under the provisions of these regulations." 31 C.F.R. § 315.35(a). Series E bonds will be paid "at any time after two months from issue date at the appropriate redemption value," while Series H bonds "will be redeemed at face value at any time after six (6) months from issue date." <u>Id.</u> § 315.35(c), (e). Series A, B, C, D, F, and J bonds "will be paid at face value," while Series G and K bonds "will be paid at face value plus the final semiannual interest due." <u>Id.</u> § 315.35(b), (d).

Subsection 315.39, entitled "[s]urrender for payment," provides that individual owners or co-owners of Series A–E bonds "may present the bond to an authorized payment agent for redemption." <u>Id.</u> § 315.39(a). "[F]or all other cases," the "owner or coowner, or other person entitled to payment" must "appear before an officer authorized to certify requests for payment, establish his or her identity, sign the request for payment, and provide information as to the address to which the check in payment is to be mailed." <u>Id.</u> § 315.39(b).

Subsection 315.25 authorizes relief in the event of "the loss, theft, destruction, mutilation, or defacement of a bond after receipt by the owner." <u>Id.</u> Such relief may include "the issue of a substitute bond or . . . payment." <u>Id.</u> "As a condition for granting relief," Treasury "may require a bond of indemnity, in the form, and with the surety, or security [Treasury] considers necessary to protect the interests of the United States." <u>Id.</u> Further, "[i]n all cases[,] the savings bond must be identified by serial number and the applicant must submit satisfactory evidence of the loss, theft, or destruction." <u>Id.</u> If the serial number of the bond is not known, "the claimant must provide sufficient information to enable [Treasury] to identify the bond by serial number." <u>Id.</u> § 315.26(b) (citing <u>id.</u> § 315.29(c)).

**E.    Additional Relevant Regulations**

The savings bond regulations also contain a waiver provision. <u>Id.</u> § 315.90. Under § 315.90, Treasury "may waive or modify any provision or provisions of [the] regulations . . . . [i]f such action would not be inconsistent with law or equity"; "if it does not impair any existing rights"; and "if [Treasury] is satisfied that such action would not subject the United States to any substantial expense or liability." Further, the regulations empower Treasury to "require . . . [s]uch additional evidence as [it] may consider necessary or advisable, or [to require] [a] bond of indemnity, with or without surety, in any case in which [it] may consider such a bond necessary for the protection of the interests of the United States." <u>Id.</u> § 315.91.

Finally, Treasury has issued regulations to govern the disclosure of records and information related to outstanding securities, including savings bonds. See id. § 323.2. Specifically, § 323.2(b) states that "[r]ecords relating to the purchase, ownership of, and transactions in Treasury securities . . . will ordinarily be disclosed only to the owners of such securities, their executors, administrators or other legal representatives or to their survivors." Id. The regulation notes that "[t]hese records are confidential because they relate to private financial affairs of the owners." Id. Further, according to Treasury, these records "fall[] within the category of 'personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy' under the Freedom of Information Act (FOIA)." Id. (citing 5 U.S.C. § 552(b)(6)). Thus, according to Treasury, such records are exempt from FOIA requests. See id.

## II.   Background on State Unclaimed Property Laws

All fifty states have statutes governing the disposition of unclaimed or abandoned real and personal property. See David J. Epstein, 1-1 Unclaimed Property Law § 1.06(1) (2017). These laws are "rooted in the common-law doctrine of escheat, under which '[s]tates as sovereigns may take custody of or assume title to abandoned . . . property.'" Estes, 123 Fed. Cl. at 77 (citation omitted) (quoting Delaware v. New York, 507 U.S. 490, 497 (1993)) (alterations in original).

For the most part, state unclaimed property laws are custodial in nature. See Epstein, supra, § 1.06(2). When a state with a custody-based unclaimed property law acquires unclaimed property, it "does not take title to [the] unclaimed property, but takes custody only, and holds the property in perpetuity for the owner." Estes, 123 Fed. Cl. at 77 (quoting Unif. Unclaimed Prop. Act, prefatory note (1995), http://www.uniform laws.org/shared/docs/unclaimed%20property/uupa95.pdf). Indeed, Kansas's Unclaimed Property Act is custodial in nearly every respect. See Kan. Stat. Ann. § 58-3936 ("Except as otherwise provided in this act or by other statute of this state, property that is presumed abandoned, whether located in this or another state, is subject to the custody of this state . . . .").

In 2000, however, the Kansas legislature amended its Unclaimed Property Act with respect to U.S. savings bonds to allow Kansas to take title (rather than assert custody over) bonds deemed to be abandoned under the Act. See id. § 58-3979. Specifically, the relevant provision provides that "United States savings bonds which are unclaimed property [as defined by the Act] . . . shall escheat to the state of Kansas three years after becoming unclaimed property . . . and all property rights to such United States savings bonds or proceeds from such bonds shall vest solely in the state of Kansas."[3] Id. § 58-3979(a). Then, "[w]ithin 180 days . . . the administrator [of the unclaimed property scheme, i.e., the state treasurer] shall commence a civil action in the district court of

---

[3] A number of other states have since enacted similar amendments to their unclaimed property laws. See Ark. Code Ann. § 18-28-231; Fla. Stat. §§ 717.1382–.83; Ind. Code § 32-34-1-20.5; Ky. Rev. Stat. Ann. § 393.022; La. Stat. Ann. § 9:182; Miss. Code Ann. § 89-12-59; S.C. Code Ann. §§ 27-18-75 to -76; S.D. Codified Laws § 43-41B-44.

Shawnee county for a determination that such United States savings bonds shall escheat to the state." Id. § 58-3979(b).

### III.   Treasury's Historical Treatment of States' Attempts to Redeem Bonds Obtained Via Their Unclaimed Property Laws

As discussed below, the government argues that the Court owes deference to the interpretation of Treasury's regulations that it has proffered in this case. Because Treasury's historical application of its regulations is relevant to whether the Court owes deference to Treasury's proffered interpretation, the Court sets forth below Treasury's historical treatment of states' attempts to redeem U.S. savings bonds in some detail.

### A.   The 1952 Escheat Decision Regarding Bonds in Possession and New York's Custodial Unclaimed Property Law

Treasury first confronted a state's attempt to redeem bonds obtained under an unclaimed property law in 1952, when it refused the State of New York's request to redeem four bonds in its possession. See Def.'s Mot. for Summ. J. (Def.'s Mot.) App. at A1, ECF No. 86-1 (Bureau of the Public Debt, Public Debt Bulletin No. 111 (Feb. 27, 1952)) (hereinafter "the 1952 Escheat Decision"). New York obtained the bonds pursuant to its unclaimed property law after their owner died intestate in a state institution. Id. Treasury noted that under New York's law, the state took custody of, but not title to, abandoned property. Id. at A3–4. According to Treasury, under those circumstances, payment of the bond's proceeds into New York's custody would violate the bond's terms (as set forth in Treasury's regulations). Id. at A2–3. Treasury explained that such a payment would alter the rights of the parties to the bond contract by "substitut[ing]" the bondholder's right to claim redemption from the United States for a right to "prosecute a claim against the State Comptroller of New York"; or, alternatively, by exposing the United States to "the necessity of making double payment" and then pursuing "a right to claim relief from the Comptroller" itself. See id. at A2.

In Treasury's view, "[n]either of th[ose] possible alterations of contract is contemplated in the agreement by which the United States pledges its faith on its securities." Id. And, citing Clearfield Trust Company v. United States, 318 U.S. 363, 366 (1943), Treasury asserted the supremacy of the rights created by federal law over the operation of New York's unclaimed property law. See id. at A2–3.

Treasury then contrasted New York's request with a hypothetical request for payment made by "one who succeeds to the title of the bondholder" pursuant to the regulations, such as "the duly qualified representative of the estate of a decedent bondholder." Id. at A3 (internal quotation and emphasis omitted). In that case, Treasury stated, payment "is not regarded as a violation of the agreement, but, on the contrary, as payment to the bondholder in the person of his successor or representative." Id. (emphasis omitted). "Thus," Treasury continued, "although the regulations do not mention such a case, [Treasury] recognizes the title of the state when it makes a claim based upon a judgment of escheat." Id.

**B.** **Subsequent Decisions Where States Were In Possession of U.S. Savings Bonds**

Treasury reiterated its position on custodial unclaimed property laws in 1970, when the State of Oklahoma tried to redeem bonds it had obtained from unclaimed safe deposit boxes. See id. at A5–7. According to Treasury, one of "the problems involved in recognizing a State's right to receive payment of unclaimed or abandoned Government securities . . . . relate[d] to the issue as to whether the State has actually succeeded to title and ownership of the securities, or whether it is acting as a repository." Id. at A6. "This is a critical distinction," Treasury stated, because "the discharging of the obligation represented by the securities must have validity for all jurisdictions." Id. "Ordinarily," Treasury continued, "such a discharge results only where a valid escheat has occurred." Id. Oklahoma's unclaimed property law, however, "d[id] not purport to vest title to the abandoned property in the State," but "[was] quite clear that the State's role [wa]s essentially custodial." Id. at A7.

Over the next thirty years, Treasury repeatedly denied claims from states with custodial unclaimed property laws and bonds in their possession. See id. at A8 (Indiana, Nov. 19, 1971); id. at A10 (New Hampshire, May 12, 1976); id. at A12 (South Carolina, May 26, 1976); id. at A15 (Hawaii, July 14, 1976); id. at A17 (Indiana, Jan. 18, 1977); id. at A19 (North Dakota, June 24, 1977); id. at A22 (Illinois, Oct. 27, 1980); id. at A39 (Kentucky, Sept. 6, 1983); id. at A40 (Alaska, Oct. 25, 1983); id. at A109 (Alaska, Feb. 6, 1992); id. at A112 (Oklahoma, Aug. 5, 1999). As early as 1976, Treasury described as "long-standing" its position that it would "recognize claims by States for payment of United States securities where the States have actually succeeded to the title and ownership of the securities pursuant to valid escheat proceedings." Id. at A10.

Treasury apparently first considered a state's claim based on a title-based unclaimed property law in 1982, in response to a request for information from the Commonwealth of Massachusetts. See id. at A24–38. The request concerned approximately $250,000 in savings bonds that Massachusetts obtained via its unclaimed property law. Id. at A24. At the time, Massachusetts's unclaimed property law provided that "[p]roperty which has been surrendered to the state treasurer under [the unclaimed property law] shall vest in the commonwealth." Id. at A31. In its request, Massachusetts asked Treasury whether it "would . . . be able to either escheat to [the Commonwealth] the approximately $250,000 [in] bonds now accumulated . . . or some how [sic] through your regulation or ruling be able to return them to their rightful heirs." Id. at A24.

In its response, Treasury informed Massachusetts that it would recognize a state's claim pursuant to a title-based unclaimed property law if the law included sufficient due process protections for the named bondholders. Id. at A37. Specifically, Treasury stated that:

> In accordance with the bond contract, we will recognize a request for payment on behalf of the state pursuant to a statute which provides for the administrative escheat, i.e., vesting of title, of abandoned property, where the application of the statute is

> conditioned upon the furnishing of adequate notice and reasonable
> opportunities for interested parties to be heard.

Id. Further, Treasury elaborated, "[u]nder the terms of the bond contract, we could make payment to the Treasurer of the Commonwealth where the Commonwealth, through appropriate court proceedings, takes the owner's title to itself." Id. at A38. "In that event, [Treasury] would pay the owner in the person of its successor, the Commonwealth." Id.

### C. Treasury's Treatment of States' Requests to Obtain the Proceeds of Bonds They Did Not Possess

#### 1. Decisions and Guidance

By the early 2000s, the number of matured, unredeemed savings bonds ballooned as bonds purchased in the 1960s and 1970s finally reached maturity. In 2004, several states requested that Treasury redeem these bonds in bulk (the "2004 requests"). The states did not possess the vast majority of these bonds, but, according to the states, the bonds were statistically likely to be in the hands of their citizens. See, e.g., id. at A127 (March 30, 2004 letter from the treasurer of Kentucky "estimat[ing] that over $150 million" in unredeemed savings bonds "rightfully belong[] to Kentuckians" and "requesting . . . that [Treasury] return these funds to . . . Kentucky so that [the] Unclaimed Property Division . . . can begin the work of returning this money to its rightful owner[s]"); id. at A129 (April 2, 2004 letter from the treasurer of the District of Columbia estimating that "between $50 and $75 million" in unredeemed savings bonds belonged to District of Columbia citizens and "seeking to have th[o]se assets and records transferred to the District of Columbia so that we can begin to find the rightful owners"); id. at A130 (April 21, 2004 letter from the treasurer of New Hampshire positing that "somewhere between $35 million and $45 million" in unredeemed savings bonds "would likely belong to New Hampshire residents" and requesting that Treasury "provide owner information and deliver funds due" for those bonds).

Treasury denied the 2004 requests. E.g., id. at A140–41 (Kentucky); id. at A138–39 (District of Columbia); id. at A142–43 (New Hampshire). In its denials, Treasury explained that it "d[id] not have the legal authority" to grant the states' requests because "[a] U.S. Savings Bond is a federal contract between the United States and the registered owner on the bonds, and under federal regulations payment may only be made to the registered owner." E.g., id. at A140. "In order for the bonds to be paid," Treasury continued, the state "must have possession of the bonds, statutory authority to obtain title to the individual bonds, obtain an order of escheat from a court of competent jurisdiction vesting title in the [state] to the individual bonds, and apply to [Treasury] for payment." E.g., id.

In 2006, Florida submitted a similar request to redeem or obtain custody over the proceeds of bonds that it did not possess. See id. at A148. As with the 2004 requests, Treasury denied Florida's request. Id. Unlike with the denials of the 2004 requests, however, Treasury did not mention any possession requirement. See id. Rather, Treasury stated that:

> The applicable regulations would permit the state of Florida to be paid for the bonds, pursuant to an appropriate state statute and after due process, by obtaining an order of escheat from a court of competent jurisdiction vesting title in the state, and then applying for payment to the Department of the Treasury pursuant to the procedures established by the regulations that all bond owners must utilize.

Id.

### 2.    Subsequent Litigation

In September 2004, the State of New Jersey filed an action in federal district court challenging Treasury's denial of its 2004 request to pay over the proceeds of matured but unredeemed bonds whose owners' last known addresses were in the state. See Treasurer of N.J., 684 F.3d at 392. Several more states eventually joined that litigation. See id. at 392–93. The district court dismissed the case for failure to state a claim, reasoning that the states' custodial unclaimed property laws conflicted with Treasury's regulations. Id. at 394–95. Further, the district court found that applying those laws to unredeemed bonds that the states did not possess would violate the principle of intergovernmental immunity. Id.

The states appealed the decision to the United States Court of Appeals for the Third Circuit. See id. at 395. In its brief before the Third Circuit, the government acknowledged that although Treasury's regulations "generally provide that payment on a U.S. savings bond will be made only to the registered owner," they also set forth "exceptions to this rule, including cases in which a third party obtains ownership of the bond through valid judicial proceedings." Br. for Appellees at 6, Treasurer of N.J., 684 F.3d 382 (No. 10-1963) (citing 31 C.F.R. §§ 315.20(b) and 315.23). Further, Treasury advised that "[a] State may satisfy this ownership requirement 'through escheat, a procedure with ancient origins whereby a sovereign may acquire title to abandoned property if after a number of years no rightful owner appears.'" Id. (quoting Texas v. New Jersey, 379 U.S. 674, 675 (1965)). "Accordingly," the government continued, it had "long advised state governments that, to receive payment on a U.S. savings bond, [the] State must go through an escheat process that satisfies due process and awards title to the bond to the State, making the State the rightful owner of the bond." Id.

According to the government's brief, however, the states involved in the litigation "d[id] not claim to have obtained title to any of the U.S. savings bonds at issue," and thus "d[id] not assert a right to receive payment under the federal regulation that authorizes payment to a third party that obtains ownership of a bond through valid judicial proceedings." Id. at 8. Nowhere in its brief did the government assert the states' lack of possession as a factor affecting their claims. See id.

The Third Circuit affirmed. Treasurer of N.J., 684 F.3d at 413. With respect to preemption, it concluded that Treasury's regulations "preempt[ed] the States' unclaimed property acts insofar as the States s[ought] to apply their acts to take custody of the

proceeds of the matured but unredeemed savings bonds" because the acts "conflict[ed] with federal law regarding [the] bonds in multiple ways." Id. at 407. First, paying over the proceeds of the bonds would inhibit Treasury's "goal of making the bonds 'attractive to savers and investors.'" Id. at 407–08 (quoting Free, 369 U.S. at 669). Congress, the court noted, had authorized Treasury to "implement regulations specifying that 'owners of savings bonds may keep the bonds after maturity'"; the states' unclaimed property laws, "by contrast, specify that matured bonds are abandoned and their proceeds are subject to the acts if not redeemed within a time period as short as one year after maturity." Id. (quoting 31 U.S.C. § 3105(b)(2)(A)).

Second, by "effectively . . . substitut[ing] the respective States for the United States as the obligor on the affected savings bonds," the operation of the unclaimed property laws "would interfere with the terms of the contracts." Id. at 408. Instead of the "federal redemption process . . . set forth . . . in the relevant statutes and regulations," bondholders "would have to comply with [the] procedures set forth in the various States' unclaimed property acts." Id. The "application of the States' acts in the redemption process" would thus impermissibly "alter [the redemption] process as contemplated in the relevant federal regulations." Id. at 409.

On the principle of intergovernmental immunity, the Third Circuit determined that the operation of the states' unclaimed property laws would "interfere with Congress's '[p]ower to dispose of and make all needful Rules Acts and Regulations respecting the . . . Property belonging to the United States.'" Id. at 410 (quoting U.S. Const. art. IV, § 3, cl. 2) (alterations in original). "Although the United States must pay holders of matured bonds the sums due on the bonds when the owners present them for payment," the court reasoned, "until it does so the funds remain federal property." Id. at 411. Further, the Third Circuit determined that the states' unclaimed property laws would unlawfully regulate the federal government by requiring it to comply with state accounting, record-keeping, and reporting requirements. Id. In the court's view, "forcing the Federal Government to account to the plaintiff States for unredeemed savings bonds or their proceeds . . . would result in a direct regulation of the Federal Government in contravention of the Supremacy Clause." Id. at 412.

In the wake of the Third Circuit's ruling, Montana and four other states filed a petition for a writ of certiorari to the United States Supreme Court. See Dir. of the Dep't of Revenue of Mont. v. Dep't of Treasury, 133 S. Ct. 2735 (2013) (mem.). The Solicitor General opposed certiorari. See Pl.'s Cross-Mot. for Partial Summ. J. & Br. in Opp'n to Def.'s Mot. for Summ. J. (Pl.'s Mot.) App. at A304–37, ECF No. 87-1 [hereinafter "SG's Brief"]. As in the briefing before the Third Circuit, the Solicitor General acknowledged that under 31 C.F.R. § 315.20(b), third parties may "obtain[] ownership of . . . bond[s] through valid judicial proceedings." Id. at A311. "Accordingly," the Solicitor General continued, Treasury had "long advised the States that to receive payment on a U.S. savings bond a State must complete an escheat proceeding that satisfies due process and that awards title to the bond to the State, substituting the State for the original bondholder as the lawful owner." Id. at A312. Further, as with the government's brief before the Third Circuit, the states' lack of possession of the bonds was not presented as pertinent to

the issue before the Court. See id. at A320–36. The Supreme Court ultimately denied the petition. Dir. of the Dep't of Revenue of Mont., 133 S. Ct. at 2735.

## IV.   Other Guidance Provided by Treasury

From time to time, Treasury has also provided public guidance on its savings bond redemption policies. As most relevant to this case, Treasury has posted information about purchasing and redeeming U.S. savings bonds on its website, TreasuryDirect.gov. From 2000 through the initiation of this litigation, an FAQ page on that website included the following question regarding states with permanent escheat laws:

> In a state that has a permanent escheat law, can the state claim the money represented by securities that the state has in its possession[?] For example, can a state cash savings bonds that it's gotten from abandoned safe deposit boxes?

See Def.'s Mot. App. at A115; see also Estes, 123 Fed. Cl. at 87 n.11. In its answer, Treasury confirmed that it "recognize[s] claims by States for payment of United States securities where the States have succeeded to the title and ownership of the securities pursuant to valid escheat proceedings." Def.'s Mot. App. at A115. "[I]n such [a] case," Treasury continued, "payment of the securities results in full discharge of . . . Treasury's obligation and the discharge is valid in all jurisdictions." Id.

## V.   Kansas's Claim to Ownership Over the Bonds at Issue in This Case

### A.   Kansas's Initial Requests for Information Regarding Bonds It Did Not Possess

On June 19, 2000, Kansas's state treasurer sent Treasury a letter informing Treasury that Kansas intended to appoint an agent to conduct "an examination of [Treasury's] books and records" related to "unredeemed US Savings Bonds subject to escheat" under its Unclaimed Property Act. Id. at A116. Kansas's letter also purported to grant the agent the authority to "instruct [Treasury] to deliver all unredeemed US Savings Bonds found due and owing to a custodian on behalf of, and in trust for, the State." Id.

Treasury responded on August 11, 2000. Id. at A118. In line with its prior guidance, it explained that it would "recognize claims by States for payment of United States securities where the States have actually succeeded to the title and ownership of the securities pursuant to valid escheat proceedings." Id. Treasury acknowledged that Kansas claimed to have recently "changed its custodial statutes to provide for the escheat of savings bonds" and suggested that Kansas's Attorney General provide Treasury with "[an] analysis and opinion regarding these statutes." Id.

Kansas provided the analysis and opinion on October 30, 2000. Id. at A120. In the analysis, Kansas's Attorney General stated that "[c]learly, once applicable court proceedings have been favorably concluded, Kansas law provides that unclaimed United States savings bonds escheat to the State of Kansas, and all property rights to such United States savings bonds or their proceeds vest solely in the State of Kansas." Id. at A122.

Treasury responded on December 27, 2000. Id. at A124. It observed that under the Kansas Attorney General's analysis, "it would appear that . . . title is not vested in the state of Kansas unless and until the judgment of the court has been rendered that the savings bonds have escheated to the state." Id. Treasury noted, however, that it had "not received a court order or similar evidence supporting [Kansas's] request to redeem the bonds on behalf of the state." Id. Treasury then asked Kansas a number of additional questions about the application of its unclaimed property law to U.S. savings bonds, and concluded that it would "consider this matter further" after it received Kansas's response. Id. at A124–25. Kansas apparently never responded to the letter.

More than a decade later, on June 4, 2012, Kansas sent Treasury a FOIA request "seeking records, or access to records, concerning unclaimed U.S. savings bonds that were issued before December 31, 1974[,] to bondholders with last known addresses in the state of Kansas." Pl.'s Mot. App. at A201. Treasury responded on July 17, 2012. Id. at A208. Treasury explained that, in its view, "[r]ecords of an individual's securities" were exempt from FOIA as "files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." Id. (citing 5 U.S.C. § 552(b)(6)). Further, Treasury pointed to its own regulation, 31 C.F.R. § 323.2, which (as noted above) states that "[r]ecords relating to the purchase, ownership of, and transactions in Treasury securities or other securities handled by the Bureau of the Public Debt . . . will ordinarily be disclosed only to the owners of such securities, their executors, administrators or other legal representatives." Id. Based on these provisions, Treasury denied Kansas's request. Id. at A209.

**B.    Escheat Proceedings in Kansas State Court**

After receiving this denial, on January 3, 2013, Kansas's state treasurer filed an escheatment action in the District Court of Shawnee County "seeking a determination that all right and legal title in, and ownership of, certain matured, unredeemed United States savings bonds, which are unclaimed property under the Kansas Disposition of Unclaimed Property Act . . . shall escheat to the State of Kansas." See id. at A178. Along with its petition, Kansas filed a motion seeking leave to effect service by publication on the "purchasers or owners" of certain U.S. savings bonds who had "last known addresses in the state of Kansas according to the records of the U.S. Treasury Department."[4] Id.

In the motion, Kansas noted that it had in its possession 1,481 bonds "originally owned by 213 individual apparent owners." Id. at A181. It had obtained these bonds "[i]n most cases" when they were "turned over to the Treasurer's office because they had remained unclaimed in bank safe deposit boxes for a period of at least five years." Id. at A180. Kansas believed that it had obtained current addresses for twelve of these 213

---

[4] The specific bonds at issue included "40-year Series E bonds issued between 1941 and December 31, 1964"; "30-year Series E bonds issued between 1965 and December 31, 1974"; "Series A, B, C, D, F, G, J and K bonds (all of which were issued prior to 1958)"; and "Series H bonds issued before December 31, 1974." Pl.'s Mot. App. at A178.

individuals. Id. at A181. On the other hand, Kansas had been "unable to locate" the other 201 individuals. Id. at A182.

"Separate and apart" from the bonds in its possession, Kansas stated that "most of the Kansas Unclaimed U.S. Savings Bonds at issue in the . . . case" were "not in the physical possession of the Kansas Treasurer." Id. Rather, according to Kansas, those bonds "h[ad] been lost, stolen, destroyed, or otherwise made unavailable." Id. Kansas described these as "the absent bonds." Id. (quotation omitted). Kansas noted that, as to the absent bonds, it had no information "concerning the identity or location of [the] apparent owners." Id. It further advised the Court that Treasury had "refused to provide such information to [Kansas]" because of its policy against "provid[ing] such information to anyone other than the title owner of the bonds." Id. Thus, according to Kansas, there was "no way for [it] to search for the names and addresses of the unknown owners" of the absent bonds "until [Kansas] obtains title by way of this escheat proceeding." Id. at A183. "Under these circumstances," Kansas contended, "it is appropriate for this escheat proceeding to be initiated by service of process by publication." Id. at A185.

The court granted Kansas's motion on January 4, 2013. Id. at A214. Pursuant to Kansas's Unclaimed Property Act, Kansas then published notice of the escheatment action in newspapers across the state for three consecutive weeks. Id. at A219. It also published notice on the Kansas state treasurer's website. Id. Soon after, on March 29, 2013, the state court issued a judgment of escheat. Id. at A213–21. The court found that at the time Kansas filed its petition, it had "physical custody of approximately 1,481 Kansas Unclaimed U.S. Savings Bonds." Id. at A214. Further, it found that "it is estimated, upon information and belief, that there are approximately $151.8 million in absent Kansas Unclaimed U.S. Savings Bonds that have been lost, stolen, or destroyed, and are thus[] not currently in the possession of [Kansas]." Id. at A215. The court also found that "those unredeemed bonds belonging to Kansas citizens confer a right to collect matured principal and interest from the U.S. Treasury," and that "[t]his right is intangible property subject to" Kansas's Unclaimed Property Act. Id. at A216–17.

Based on these findings, the court determined that Kansas was "seeking to take ownership of and title to the subject bonds and the right to proceeds thereof through this state's valid judicial escheat proceedings as the sole owner of and ultimate heir to such bonds and proceeds." Id. at A217–18. Further, the court concluded that "all of the above-described Kansas Unclaimed U.S. Savings Bonds . . . have been unclaimed and abandoned property pursuant to the provisions of" Kansas's Unclaimed Property Act. Id. at A218. Finally, the court found that "exceptional efforts ha[d] been undertaken to locate the owners of [the] bonds and [to] provide notice of these proceedings far in excess of the due diligence and notice requirements" set forth in Kansas law. Id. at A219.

For these reasons, the court issued a declaratory judgment stating that the bonds at issue "constitute abandoned and unclaimed property pursuant to the laws of the State of Kansas and are therefore subject to escheatment." Id. at A220. It further declared that "such unclaimed and abandoned Bonds . . . include the Absent Kansas Unclaimed U.S. Savings Bonds, which have been lost, stolen, or destroyed, and which have registered owners with last known addresses in the State of Kansas." Id. at A220–21. "[P]ursuant to

[its] powers of escheatment," the court then decreed that "all rights and legal title to, and ownership of the above described Kansas Unclaimed U.S. Savings Bonds and the proceeds thereof . . . shall escheat to the State of Kansas." Id. at A221.

### C.   Kansas's Request to Redeem the Purportedly Escheated Bonds

On May 13, 2013, Kansas sent Treasury a "two-fold" redemption request for the bonds that were the subject of the state court proceedings. Id. at A341. First, it requested redemption of the bonds in its possession.[5] Id. Second, it requested "payment of the proceeds of those Absent Kansas Unclaimed U.S. Savings Bonds which the Kansas District Court, in its Judgment of Escheatment, declared lost, stolen, or destroyed, and which had registered owners with last known addresses in Kansas." Id. at A341–42. According to Kansas, "[t]he state of Kansas . . . gained title to and ownership of the Absent Bonds and their proceeds by valid judicial escheatment proceedings." Id. at A342. "Therefore," it continued, "Kansas, as owner of the Absent Bonds, can now redeem these bonds and collect their proceeds." Id.

Further, "[w]ith respect to [its] claim for redemption of the proceeds of the Absent Bonds," Kansas "request[ed] that [Treasury] either re-issue the bonds to the state of Kansas as owner or provide the records, including serial numbers, regarding the Absent Bonds that U.S. Treasury will require for redemption of each Absent Bond." Id. at A343 (emphasis in original). Noting that under 31 C.F.R. § 323.2(b) records regarding U.S. Savings Bonds will "ordinarily be disclosed only to the owners of such securities," Kansas claimed that "[t]he information regarding the securities that have escheated to the state of Kansas must be made available to the owner of those securities, Kansas." Id. (emphasis in original).

On October 9, 2013, Treasury responded to the first portion of Kansas's redemption request (regarding the bonds in its possession). Id. at A358. Treasury requested that Kansas provide it with a certified copy of the judgment of escheat, certain information about the state treasurer, and the bonds themselves, signed by the state treasurer. Id. "Assuming the savings bonds you surrender are legitimate and have not previously been redeemed," Treasury stated, it "anticpate[d] redeeming them in the normal course after receiving" the requested information.[6] Id. at A359.

About a week later, on October 16, 2013, Treasury responded to the second portion of Kansas's redemption request (regarding the absent bonds). Id. at A360–61. Treasury stated that it was "unable to grant [Kansas's] request to redeem" the absent bonds. Id. at A360. Under its regulations, Treasury claimed, registration was "conclusive of ownership," and Treasury was "only authorized to redeem a savings bond to the

---

[5] Although the state court proceedings involved 1,481 bonds in Kansas's possession, the state requested that Treasury redeem just 1,445 of those bonds. See Pl.'s Mot. App. at A341.

[6] Treasury in fact redeemed the bonds a short time later. See Pl.'s Mot. App. at A362.

registered owner." Id. According to Treasury, however, "[e]scheatment claims by states are not an explicit exception to the conclusive ownership requirements." Id. (citation omitted). "In the past," Treasury acknowledged, it had "interpreted its regulations to allow some state escheatment claims, but only when the state possesse[d] the savings bonds in its claim." Id. at A360–61. Kansas, however, was neither "the registered owner of the savings bonds, nor d[id] it possess them." Id. at A361.

Treasury also noted that because Kansas did not possess the bonds, it could not "comply with requirements in the savings bond contract concerning surrender of the Absent Bonds." Id. "As provided in [Treasury's] regulations," Treasury stated, "an owner seeking to redeem a savings bond must surrender it to the Treasury Department . . . unless the owner can show that the savings bond was lost, stolen, or destroyed." Id. (footnote omitted). But "Kansas [could not] present the Absent Bonds for payment, presumably because the savings bonds are in the possession of the registered owners or their heirs." Id. And, according to Treasury, its "regulations do not provide that owners abandon their right to payment simply because they have not redeemed a matured savings bond." Id. Rather, the owners' "contract[s] with the United States allow[] them to redeem their savings bonds at any time, even after maturity." Id. (footnote omitted).

Finally, Treasury rejected Kansas's request for information about the absent bonds. Id. In its view, "turn[ing] over the Absent Bond records would violate the rights of the registered owners" under the Privacy Act. Id. Further, Treasury noted that it "does not index its registration records according to the state of the registered owner." Id. Treasury thus "would have to search millions of records by hand to fulfill Kansas'[s] request," which "would be prohibitively expensive." Id.

## VI.  Commencement of This Action and the Government's Motion to Dismiss

After receiving these responses, Kansas filed this action on December 20, 2013. Compl., ECF No. 1. It alleges that as a result of the state court judgment of escheat, it is in privity of contract with the United States with respect to the absent bonds. Id. ¶¶ 1, 84. It also alleges that it "made proper presentment under applicable federal regulations of the U.S. savings bond contracts" for both sets of bonds. Id. ¶ 90.

Kansas's complaint incorporates several theories of liability. First, in Count I, Kansas claims that Treasury's "refusal to provide necessary and required information regarding the Absent Bonds, and its further refusal to accept presentment and redeem the Absent Bonds" constituted a breach of express contracts between it and the United States—i.e., the savings bonds to which it claims title. Id. ¶¶ 93, 95. It requests damages "believed to be in excess of $151,800,000" based on "the matured value . . . of all lost, stolen, destroyed or otherwise abandoned U.S. savings bonds . . . now owned by [Kansas] which are registered with [Treasury] and having last known addresses in the State of Kansas."[7] Id. at 24. Relatedly, in Count III, Kansas claims that the government has

---

[7] In Count II of its complaint, Kansas alternatively claims that the bonds constitute implied-in-fact contracts between it and the United States, and that the government has breached those contracts. See Compl. ¶¶ 96–108. And in Count V of its complaint, it

breached fiduciary duties in connection with the express contracts, and that it is entitled to damages as a result. Id. ¶¶ 109–115. And in Count VII, Kansas claims that the government's refusal to redeem the bonds constitutes a taking of private property without just compensation in violation of the Fifth Amendment's Takings Clause.[8] Id. ¶¶ 141–43.

Finally, in Count VI, Kansas also seeks a declaratory judgment that the government has breached its obligations on the savings bond contracts. Id. ¶¶ 133–40. In particular, it asks the Court to enter an order declaring (among other things) that the government has "no right, title, or interest to the Absent Bonds"; that the government has "wrongfully asserted custody and/or ownership over [Kansas's] Absent Bonds"; and that the government has "failed to turn over to [Kansas] required and necessary information regarding the Absent Bonds, namely serial numbers, addresses, and other information which would identify those bonds with last known addresses in the State of Kansas." Id. at 35. Kansas also asks the Court to order the government to "provide [Kansas with] the information necessary to identify those Absent Bonds registered with last known addresses in the State of Kansas" and to "accept [Kansas's] presentment and redemption of the subject Absent Bonds." Id.

As discussed in Estes, the government moved to dismiss Kansas's claims other than its takings claims for lack of subject matter jurisdiction, and to dismiss its takings claim for failure to state a claim. 123 Fed. Cl. at 80. The Court determined, however, that it had subject matter jurisdiction over Kansas's contract, estoppel, and declaratory judgment claims because "the government's argument—that Kansas was not a party to the contract[s] because under Treasury's [r]egulations it was not the owner of the Absent Bonds—[went] to the merits of Kansas's . . . claims, not th[e] Court's jurisdiction over them." Id. at 82–83. Therefore, the Court treated the government's entire motion as a motion to dismiss for failure to state a claim, and concluded that Kansas had stated a plausible claim for relief with respect to its contract, estoppel, declaratory judgment, and takings claims. Id. at 85, 90–91. On the other hand, it dismissed Kansas's third-party beneficiary claim. Id. at 90.

The Court's ruling on Kansas's contract and declaratory judgment claims turned on a narrow issue of regulatory interpretation around which the parties framed their

---

alternatively claims that it is a third-party beneficiary of the savings bond contracts, and that the government's breach of those contracts entitles it to damages. See id. ¶¶ 125–32.

[8] As a corollary to these claims, Kansas also asserts, in Count IV, that the government "should be equitably estopped from asserting that [its] claims for relief are wrongful." Id. ¶ 117; see also id. ¶ 118 (contending that the government "misled" Kansas by "making statements and taking action indicating that it would redeem Kansas's absent Bonds," including the government's "recognition of Kansas's ownership of the Bonds in Possession and redeeming the proceeds thereof upon request"); id. ¶ 120 (asserting that the government "concealed material facts" by "engag[ing] in self-serving refusals to honor FOIA and other requests that would reveal necessary and requested information about . . . Kansas['s] Absent Bonds").

briefs. See id. at 81–85; see also Def.'s Mot. to Dismiss at 10–16, ECF No. 9; Pl.'s Resp. to Def.'s Mot. to Dismiss at 22–29, ECF No. 15. In particular, the government centered its arguments on Subpart E of Treasury's regulations, 31 C.F.R. §§ 315.20–.23, which (as discussed above) sets forth "[l]imitations on [j]udicial [p]roceedings" with respect to U.S. savings bonds. See Def.'s Mot. to Dismiss at 11–12.

Advancing a restrictive interpretation of 31 C.F.R. § 315.20(b)—which states that Treasury "will recognize a claim against an owner of a savings bond . . . if established by valid, judicial proceedings, but only as specifically provided in this subpart"—the government contended that escheat judgments could never form the basis of claims of ownership under the regulations because such judgments were not specifically provided for elsewhere in Subpart E. Id. at 11–13. Rather, according to the government, Subpart E only specifically provided for two types of claims: "claims under a divorce decree (§ 315.22(a)) and gift causa mortis claims (§ 315.22(b))." Id. at 12. Thus, the government contended, "[e]scheatment actions are not one of the 'valid judicial proceedings' recognized in the regulations." Id. And because "the only 'valid judicial proceedings' are the ones set forth in the regulations," the government reasoned, "[i]t makes no difference whether the states' escheatment statute purports to take title to or custody of the bonds." Id. at 13; see also Def.'s Suppl. Br. in Supp. of Its Mot. to Dismiss at 4 ("Only certain judicial proceedings are covered by 31 CFR 315.20, and escheat proceedings are not among them.").

The government then sought to explain away Treasury's past statements regarding state claims to bonds obtained by escheatment proceedings by contending that those statements "were made in the context of states claiming title for bonds in their possession." Def.'s Mot. to Dismiss at 13 (emphasis in original). The government maintained that position even after Kansas pointed out that the Treasurer of New Jersey litigation involved state claims for redemption of absent bonds. See Def.'s Reply Br. in Supp. of Its Mot. to Dismiss at 5–7, ECF No. 20. Further, in supplemental briefing, the government argued that its prior statements did not reflect its "considered judgment" on the meaning of its regulations; that its current litigating position did, in fact, reflect its considered judgment; and that the Court was thus required to defer to its litigating position under Auer v. Robbins, 519 U.S. 452 (1997). See Def.'s Suppl. Brief at 10–11, 15.

The Court was not persuaded by the government's arguments. See Estes, 123 Fed. Cl. at 85–90. First, it rejected the government's reading of § 315.20(b) as incompatible with the text of Subpart E as a whole. Id. at 85–86. The Court noted that in § 315.20(a), Treasury expressly disavowed recognition of two types of judicial determinations. See 31 C.F.R. § 315.20(a) (stating that Treasury "will not recognize a judicial determination that

---

[9] In supplemental briefing ordered by the Court, the government expanded its argument to include the additional types of judicial proceedings listed in 31 C.F.R. § 315.21, which concern payments to judgment creditors and the treatment of U.S. savings bonds in bankruptcy proceedings. See Def.'s Suppl. Br. in Supp. of Its Mot. to Dismiss at 5, ECF No. 28.

gives effect to an attempted voluntary transfer inter vivos of a bond, or a judicial determination that impairs the rights of survivorship conferred by these regulations upon a coowner or beneficiary"); see also Estes, 123 Fed. Cl. at 85. Accepting the government's reading of § 315.20(b), however, would render superfluous this express disavowal. Estes, 123 Fed. Cl. at 85. Further, the Court found that the government's reading "ignore[d] what appear[ed] to be [the] actual purpose" of the restrictions found in §§ 315.21 and 315.22: "to address specific considerations and concerns attendant to the types of judgments referenced" in those subsections. Id. at 86.

In an extended discussion, the Court also rejected the government's position regarding the import of its prior statements and the deference owed to its litigating position. See id. at 86–90. First, it found that the government's litigating position actively conflicted with Treasury's prior statements regarding escheat, especially statements made in connection with the Treasurer of New Jersey litigation. See id. at 87–88. That litigation, the Court noted, involved claims for custody over the proceeds of absent bonds, undercutting the government's contention that all of its prior statements were made in the context of bonds-in-possession. Id. at 88. Further, in the Court's view, possession had never served as an essential characteristic in Treasury's prior statements regarding title-based escheat, without which an escheat judgment would not have been "valid" under the regulations. See id. at 88–89. And the government's litigating position was internally inconsistent: it claimed (without any apparent factual basis) that it had exercised its waiver authority under 31 C.F.R. § 315.90 when it redeemed the bonds in Kansas's possession; and it argued in supplemental briefing that escheat judgments were invalid under the regulations because they were proceedings in rem. See id. at 88–90. The Court thus concluded that the government's ever-evolving litigating position did not reflect its considered judgment, and thus was not entitled to Auer deference. See id. at 90 ("If anything, deference is due to the interpretation that Treasury expressed for over sixty years until the instant controversy arose.").

Accordingly, the Court rejected the government's contention that all escheat judgments—whether under a title-based or custody-based state law scheme—fell outside the category of "valid, judicial proceedings" under § 315.20(b). See id.

With respect to Kansas's takings claim, the Court, following the Federal Circuit's lead, observed that a party may properly "alleg[e] in the same complaint two alternative theories for recovery against the Government . . . one for breach of contract and one for a taking under the Fifth Amendment to the Constitution." Id. at 91 (quoting Stockton E. Water Dist. v. United States, 583 F.3d 1344, 1368 (Fed. Cir. 2009)). It therefore denied the government's motion to dismiss Kansas's claims under the Takings Clause. See id.

## VII.   Treasury's Revision of the Regulations and Kansas's APA Challenge

In the meantime, on July 1, 2015 (while the government's motion to dismiss was pending), Treasury issued a Notice of Proposed Rulemaking in which it proposed revising its savings bond regulations to expressly address state court judgments of escheat pursuant to title-based unclaimed property laws. See Regulations Governing United States Savings Bonds, 80 Fed. Reg. 37,559-01 (July 1, 2015). After a period of notice and

comment, Treasury issued the final revised regulations on December 24, 2015. <u>Regulations Governing United States Savings Bonds</u>, 80 Fed. Reg. at 80,258-01. In the preamble to the revised regulations, Treasury stated that it intended for the revisions to "clarify its prior statements on escheat and to describe more formally the criteria Treasury will use to evaluate escheat claims." <u>Id.</u> at 80,259. Further, by promulgating a "uniform federal rule governing title escheat claims," Treasury would "provide formal notice to all states about the escheat claims it will recognize and how it will protect the rights of bond owners still in possession of their savings bonds." <u>Id.</u>

As relevant to the issue presented in this case, the revised rule amended 31 C.F.R. § 315.20(b) to add a sentence stating that "[e]scheat proceedings will not be recognized under this subpart."[10] <u>Id.</u> at 80,264. Treasury also added a new provision, § 315.88, to govern "[p]ayment to a State claiming title to abandoned bonds." <u>Id.</u> Under the new provision, Treasury "may, in its discretion, recognize an escheat judgment that purports to vest a State with title to a definitive savings bond that has reached the final extended maturity date and is in the State's possession." <u>Id.</u> But Treasury "will not recognize an escheat judgment that purports to vest a State with title to a bond that the State does not possess." <u>Id.</u>

Kansas and four other states challenged the rule under the Administrative Procedure Act (APA), 5 U.S.C. § 706. <u>Estes v. U.S. Dep't of Treasury</u>, 219 F. Supp. 3d 17, 22, 27 (D.D.C. 2016). They argued (among many other things) that the rulemaking was arbitrary and capricious because the new provisions "marked a change of agency policy, without any acknowledgment of that change." <u>Id.</u> at 27.

The District Court for the District of Columbia disagreed. <u>Id.</u> at 28–33. After noting that the questions it faced and the issues before this Court were "distinct in numerous respects," it concluded that the possession requirement expressed in the revised rule was not inconsistent with any clearly established prior policy.[11] <u>Id.</u> at 28 n.4, 31. Alternatively, the District Court concluded that even if the new rule did work a policy change, Treasury had not violated the APA in promulgating it because Treasury did not "depart from [its] prior policy <u>sub silentio</u> or simply disregard rules that are still on the books." <u>Id.</u> at 33 (quoting <u>FCC v. Fox Television Stations, Inc.</u>, 556 U.S. 502, 514 (2009)). Rather, it "extensively explained its Rule and its view as to why that Rule did not contradict prior statements." <u>Id.</u> There was thus "no basis for concluding that [Treasury] casually ignored prior policies and interpretations or otherwise failed to

---

[10] Thus, the revised § 315.20(b) expressly conformed to the arguments the government made in its motion to dismiss.

[11] Thus, the District Court found that although Treasury's prior statements reflected a "longstanding policy that payment requests for escheated bonds will not be honored unless a state has <u>title</u> ownership over those bonds," they "d[id] not express a policy that a state may redeem bonds without possessing them." <u>Estes v. U.S. Dep't. of Treasury</u>, 219 F. Supp. 3d at 29 (emphasis in original).

provide a reasoned explanation for its [Rule]." Id. (quoting Cablevision Sys. Corp. v. FCC, 649 F.3d 695, 710 (D.C. Cir. 2011)) (second alteration in original).[12]

## VIII.   The Pending Cross-Motions

After the Court denied the government's motion to dismiss, the parties engaged in targeted discovery regarding "the history of the Department of Treasury's recordkeeping, registration, and redemption practices regarding the types of U.S. savings bonds involved in this case, as well as information regarding the nature of how the Department's relevant savings bond records are catalogued and may best be searched." See Order (Dec. 18, 2015), ECF No. 51. Once discovery concluded, the government moved for summary judgment. ECF No. 86. Kansas then filed a cross-motion for partial summary judgment on liability, "which it asserted would fully resolve Count VI of Kansas's Complaint and partially resolve Counts I, II, III, and VII." Pl.'s Mot. at 3. The Court heard oral argument on June 22, 2017.[13]

## DISCUSSION

## I.   Standard For Summary Judgment

In accordance with RCFC 56(a), summary judgment may be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A fact is material if it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute is genuine if it "may reasonably be resolved in favor of either party." Id. at 250.

The material facts in this case are not in dispute. Further, Kansas's breach of contract claim depends upon the resolution of questions of law—namely, the interpretation of Treasury's regulations, the interplay between those regulations and Kansas's Unclaimed Property Act, and the constitutional principles raised by the government in opposition to Kansas's claims. Therefore, Kansas's breach of contract and other claims are appropriate for resolution by summary judgment.

---

[12] Kansas has appealed the District Court's ruling. See Docketing Statement, LaTurner v. U.S. Dep't of Treasury, No. 17-5015 (D.C. Cir. Mar. 2, 2017).

[13] Since Kansas filed its complaint, eight other states with title-based escheat regimes have filed similar lawsuits seeking redemption of bonds they do not possess. See Sattgast v. United States, No. 15-1364 (South Dakota); Kennedy v. United States, No. 15-1365 (Louisiana); Lea v. United States, No. 16-43 (Arkansas); Ball v. United States, No. 16-221 (Kentucky); Fitch v. United States, No. 16-231 (Mississippi); Loftis v. United States, No. 16-451 (South Carolina); Zoeller v. United States, No. 16-699 (Indiana); Atwater v. United States, No. 16-1482 (Florida). With the exception of Lea, the Court has stayed these cases pending this decision. The Court is issuing a separate Opinion and Order on cross-motions for summary judgment in Lea.

## II.    Merits

In its motion for partial summary judgment, Kansas seeks a ruling that the government is liable for breach of contract. To succeed on this claim, Kansas must first demonstrate that it is in privity of contract with the government with respect to the absent bonds—i.e., it must establish that it owns the absent bonds. See Cienega Gardens v. United States, 194 F.3d 1231, 1239 (Fed. Cir. 1998); Rotman, 31 Fed. Cl. at 725. Further, it must also show that in refusing to recognize its ownership of the bonds and in declining to redeem the proceeds of the bonds, the government materially breached the terms of the bond contracts. See Bell/Heery v. United States, 739 F.3d 1324, 1330 (Fed. Cir. 2014); San Carlos Irrigation & Drainage Dist. v. United States, 877 F.2d 957, 959 (Fed. Cir. 1989).

Kansas's contention that it is the owner of the absent bonds is predicated on 31 C.F.R. § 315.20(b), which it argues obligates the United States to recognize the state-law judgment of escheat that purported to vest it with title to the bonds. Kansas asks the Court to direct the Department of Treasury to provide it with the information it is entitled to receive pursuant to 31 C.F.R. §§ 1.5 and 323.2 as the owner of the bonds. It further requests a ruling that—notwithstanding that it currently lacks information about the whereabouts of the bond certificates—Treasury was required to redeem the bonds upon presentation of a certified copy of the state court judgment under 31 C.F.R. §§ 315.20 and 315.23, or pursuant to 31 C.F.R. § 315.25, which provides a method for owners to redeem bonds where the certificates have been lost. Kansas contends that Treasury's refusal to redeem the bonds constitutes both a breach of contract and a compensable taking of its property under the Fifth Amendment.

The government asserts, on the other hand, that Kansas has not obtained ownership of the absent bonds and that, as a result, the United States is entitled to an entry of summary judgment. It briefly reprises its contention that 31 C.F.R. § 315.20(b) does not require Treasury to recognize ownership claims arising out of state court judgments under title-based escheat statutes. Further, it argues that even if Kansas Treasury's regulations permit transfers of ownership pursuant to title-based escheat statutes, the government was not required to redeem the absent bonds because Kansas has not and cannot submit the paper bond certificates, which the government argues is a pre-requisite to its obligation to pay Kansas their proceeds. Finally, it contends that, in any event, ownership of the bonds cannot be transferred to Kansas under the circumstances of this case because: (1) the state law on which the judgment rests is preempted by federal law; (2) the underlying state law violates the principle of intergovernmental immunity; and (3) the state court proceedings did not comport with the due process clause of the Fourteenth Amendment.

For the reasons set forth below, the Court agrees that Kansas is the owner of the absent bonds pursuant to Treasury's regulations and that Treasury's refusal to recognize Kansas's ownership of the bonds is a breach of contract. It further finds that Treasury breached the contract when it refused to provide Kansas with information about the bonds and demanded that Kansas produce the bond certificates as a condition of

redeeming their proceeds. Accordingly, the Court grants Kansas's motion for partial summary judgment as to liability for breach of contract.

**A.      Whether Treasury is Required to Redeem the Absent Bonds Under Treasury's Regulations**

As discussed, 31 C.F.R. § 315.20(b) provides that Treasury "will recognize a claim against an owner of a savings bond . . . if established by valid, judicial proceedings, but only as specifically provided in this subpart." And 31 C.F.R. § 315.23(a) states that "[t]o establish the validity of judicial proceedings," a claimant must submit to Treasury "certified copies of the final judgment, decree, or court order, and of any necessary supplementary proceedings."

The facts material to the application of these regulations with respect to the absent bonds are not disputed. Thus, the parties do not dispute that Kansas obtained the state court escheat judgment, Pl.'s Mot. App. at A213–22; that the judgment concerned ownership of the absent bonds, id. at A215; and that, when it attempted to redeem the absent bonds, Kansas supplied certified copies of the judgment to Treasury in accordance with § 315.23(a), id. at A342.

In its motion for summary judgment, the government revives (albeit briefly) the arguments which this Court rejected in Estes regarding the proper interpretation of § 315.20(b). Thus, it contends that the ownership recognition requirements of § 315.20(b) do not under any circumstances apply to judgments entered pursuant to state escheatment laws. See Def.'s Mot. at 19–20 & n.3; Def.'s Reply at 30–32. It also appears to argue that—even if title to the absent bonds has passed to Kansas—the state may not redeem the proceeds of the bonds because it has not presented the bond certificates to Treasury. Both of these arguments lack merit.

**1.      Whether Treasury is Required to Recognize Kansas's Ownership Claims Based on the State Escheat Judgment**

As discussed briefly above, and in greater detail in Estes, the government's argument in support of its initial motion to dismiss was that under § 315.20(b), Treasury would recognize only those claims of ownership that arise out of the specific types of judgments referenced elsewhere in Subpart E of Part 315. Because state court escheat judgments were not referenced in the regulations, Treasury argued, they were not subject to § 315.20(b) at all. Treasury reprises this argument in its motion for summary judgment, observing once again that "Treasury's regulations do not recognize the transfer of savings bonds via escheat judgment." Def.'s Mot. at 19.

In Estes, this Court found Treasury's interpretation inconsistent with the language and structure of the regulation. See 123 Fed. Cl. at 85–86 (concluding that the government's "construction of the regulations . . . collides with the well-established canon of interpretation that holds that regulatory text should not be read in such a way as to render any portion of the language superfluous" and "ignores [the] actual purpose" of the provisions of Subpart E). The government's summary judgment briefs do not address

the Court's textual analysis or provide any basis for it to depart from its conclusion in Estes that a textual analysis of the language of § 315.20(b) establishes that Treasury is required to recognize claims of bond ownership that are based on state court judgments of escheat pursuant to valid judicial proceedings.

Nor is there anything in the government's summary judgment briefs that would alter this Court's conclusion in Estes that Treasury's position in this litigation conflicts directly with Treasury's prior explicit statements interpreting § 315.20(b). These statements, which go back more than sixty years, clearly reflect that before this litigation, Treasury took the position that states could secure ownership of savings bonds on the basis of title-based escheatment statutes like Kansas's.

Thus, as the Court explained in Estes, in its brief filed with the Third Circuit in the Treasurer of New Jersey litigation, the federal government represented that "Treasury regulations generally provide that payment on a U.S. savings bond will be made only to the registered owner," but that "[t]he regulations specify limited exceptions to this rule, including cases in which a third party obtains ownership of the bond through valid judicial proceedings." See Br. for Appellees at 6, Treasurer of N.J., 684 F.3d 382 (No. 10-1963). In particular, the government explained, "[a] State may satisfy this ownership requirement 'through escheat, a procedure with ancient origins whereby a sovereign may acquire title to abandoned property if after a number of years no rightful owner appears.'" Id. (emphasis added) (quoting Texas, 379 U.S. at 675). In its decision, the Third Circuit went on to endorse Treasury's reading of its own regulations. See Treasurer of N.J., 684 F.3d at 412–13 (observing that "the States[] may obtain ownership of . . . bonds—and consequently the right to redemption—through 'valid[] judicial proceedings'" as provided in 31 C.F.R. § 315.20(b) (second alteration in original)).

The Solicitor General made a similar representation regarding Treasury's interpretation of its regulations to the Supreme Court in 2013, in opposing a petition for certiorari filed by some of the states that were parties to the Third Circuit case. See Pl.'s Mot. App. at A304–37. In that brief, the Solicitor General, citing 31 C.F.R. §§ 315.20(b), 315.23, and 353.23, observed that Treasury "has long advised the States that to receive payment on a U.S. savings bond a State must complete an escheat proceeding that satisfies due process and that awards title to the bond to the State," and that this "represents the Department's considered interpretation of federal law." Id. at A311–12.

As the Court also explained in Estes, Treasury has long assured inquiring states that it would recognize state claims of ownership based on title-based escheat statutes. Thus, Treasury explained in the 1952 Escheat Decision that it would "recognize[] the title of the state when it makes claim based upon a judgment of escheat," because, in that case, the state has "succeed[ed] to the title of the bondholder." Def.'s Mot. App. at A3 (emphasis omitted). And Treasury continued to emphasize this position throughout the 1970s, 1980s, and 1990s in its responses to states' requests to redeem or obtain custody over the proceeds of bonds in their possession under custody-based escheat regimes. See id. at A6 (Oklahoma, June 26, 1970); id. at A8 (Indiana, Nov. 19, 1971); id. at A10 (New Hampshire, May 12, 1976); id. at A12 (South Carolina, May 26, 1976); id. at A15 (Hawaii, July 14, 1976); id. at A17 (Indiana, Jan. 18, 1977); id. at A19 (North Dakota,

June 24, 1977); id. at A22 (Illinois, Oct. 27, 1980); id. at A39 (Kentucky, Sept. 6, 1983); id. at A40 (Alaska, Oct. 25, 1983); id. at A109 (Alaska, Feb. 6, 1992); id. at A112 (Oklahoma, Aug. 5, 1999).

In addition, in 1982, Treasury informed Massachusetts that under the state's title-based escheat regime, Treasury would "make payment to the Treasurer of the Commonwealth where the Commonwealth, through appropriate court proceedings, takes the owner's title to itself." Id. at A38 (observing that "[i]n that event, [Treasury] would pay the owner in the person of its successor, the Commonwealth"). Further, Treasury referred Massachusetts to 31 C.F.R. §§ 315.23(a) and 353.23(a) as the sources of "the proper evidence to be submitted if this approach is followed." Id.

Notwithstanding the foregoing, the government contends now, as it did in the context of its motion to dismiss, that the Court should discount Treasury's pre-2000 statements because they "did not address the applicability of section 315.20(b) to title-based escheat judgments for bonds a state did not possess." Def.'s Mot. at 20 (emphasis added). But there is nothing in § 315.20(b) that purports to make possession of bond certificates a condition for Treasury's recognition of ownership claims based on valid judicial proceedings. More to the point, under Treasury's interpretation, state judgments of escheat can never confer ownership, regardless of whether the state has possession of the bond certificates. That is, under Treasury's interpretation, even a state that: (1) obtained title to the bonds through state escheatment proceedings; (2) possesses the bond certificates; and (3) presents those certificates to Treasury for redemption cannot claim an entitlement to the proceeds of the bonds. The factual distinction Treasury asks the Court to draw thus is not relevant to the legal position it advances—i.e., that the Court ought to accept its assertion that it does not recognize claims against bond holders based on state-court escheat judgments under § 315.20(b).

Indeed, Treasury's litigating position here is that to redeem even the bonds in possession to which it holds title pursuant to valid judicial proceedings, the state must persuade Treasury to waive its regulations. See Def.'s Mot. to Dismiss at 15 (contending that "[p]ursuant to [its] discretionary authority, Treasury elected to waive its regulations for the bonds in Kansas' possession" but "found no basis to waive its regulations for the Absent Bonds"). But until this litigation, Treasury never mentioned its waiver authority in any of its many pronouncements concerning states' rights to redeem bond proceeds under title-based escheat regimes; instead, it cited § 315.20. Thus, Treasury's ever-shifting explanations for denying states' requests to redeem absent bonds resemble nothing so much as a game of "whack-a-mole" in which the federal government's rationale for denying such requests changes each time the states satisfy the most recently articulated condition for doing so.

In that regard, the government also draws the Court's attention to certain 2004 correspondence between Treasury and several states that were then seeking information about the redemption of absent bonds under their custody-based escheat statutes. See Def.'s Mot. at 19–20. That correspondence, which was not before the Court when it ruled in Estes, contained a passage advising the inquiring states that "[i]n order for the bonds to be paid to [the state], [it] must have possession of the bonds, . . . obtain an order of

escheat from a court of competent jurisdiction vesting title in the state to the individual bonds, and apply to the Department of the Treasury for payment." E.g., Def.'s Mot. App. at A134.

The passing mention of a possession requirement in the 2004 correspondence does not persuade the Court to depart from its prior interpretation of the plain text of the applicable Treasury regulations. For one thing, that correspondence did not purport to interpret § 315.20(b). Nor did it address Treasury's treatment of claims brought under title-based escheat judgments for bonds that a state did not possess, as the correspondence arose in the context of state claims for bond proceeds under custody-based escheat regimes. The correspondence thus did not identify possession of the bonds as a condition of recognizing the state's claim of ownership under a title-based escheat regime, as Treasury appears to argue.

Further, the Court notes that in Treasury's subsequent 2006 correspondence with the state of Florida, there is no mention of a possession requirement. Instead, Treasury advised the State that "[t]he applicable regulations would permit the State of Florida to be paid for the bonds, pursuant to an appropriate state statute and after due process, by obtaining an order of escheat from a court of competent jurisdiction vesting title in the state, and then applying for payment to the Department of the Treasury pursuant to the procedures established by the regulations that all bond holders must utilize." Id. at A148. Accordingly, Treasury's mention of a possession requirement in the 2004 correspondence does not cast doubt upon its assurances over the more than sixty preceding years, or the representations that it made to the Supreme Court almost ten years later, all of which clearly confirmed that Treasury would recognize claims of ownership based on valid state court escheatment proceedings.[14]

---

[14] In support of its argument that § 315.20(b) is inapplicable to escheat judgments, the government cites the recent decision of the U.S. District Court for the District of Columbia in the litigation brought by Kansas and several other states to challenge Treasury's new rule. See Def.'s Mot. at 4, 20–21 n.3 & 5 (citing Estes v. U.S. Dep't of Treasury, 219 F. Supp. 3d at 32. As noted, the new rule, among other things, explicitly requires a state to possess the escheated bond in order to redeem it. See Estes v. U.S. Dep't of Treasury, 219 F. Supp. 3d at 27–28. As the district court itself acknowledged, however, the issues in that case are "distinct in numerous respects" from the issues in this one. See id. at 28 n.4. Thus, in that case, the plaintiffs argued (among other things) that the new rule violated the APA "because it capriciously abandon[ed] prior Treasury policy." Id. at 22. The issue before the district court was therefore whether the new rule "altered a clearly established policy without sufficient explanation." Id. at 28 n.4 (emphasis omitted). As noted above, the district court concluded only that there was no clearly established prior policy recognizing state claims of ownership pursuant to escheatment proceedings where the bonds were not in the state's possession, and that, in any event, if there was such a policy, Treasury had adequately explained its reasons for changing it. See id. at 28–30, 33. To the extent that the district court's decision, while

For the reasons set forth above and in its opinion in Estes, the Court is of the view that, under § 315.20(b), title and ownership of the absent bonds was transferred to Kansas pursuant to the state court escheat judgment. It turns now to the government's alternative argument that, even if Kansas has succeeded to ownership of the absent bonds, presentation of the escheated bonds is a prerequisite to their redemption. Def.'s Mot. at 20–26; Def.'s Reply at 25–30.

**2.      Whether Kansas Must Present the Certificates for the Bonds it Owns as a Condition to Securing their Redemption**

As noted, the government contends that even assuming that Kansas secured ownership of the absent bonds through the state escheatment proceedings, it cannot redeem the bonds because it does not possess them. This argument—whose premise is that the Treasury's regulations allow it to keep the proceeds of bonds indefinitely even if Kansas's ownership of the bonds has been established by valid judicial proceedings—does not withstand scrutiny.

Treasury's regulations make its payment obligation clear: under 31 C.F.R. § 315.35(a), "[p]ayment . . .  will be made to the person or persons entitled under the provisions of these regulations." Id. Generally, in order to redeem the proceeds of a bond, the bond owner must surrender the bond certificate to Treasury. See id. § 315.35. But (as noted) Treasury has the authority to waive any portion of its regulations. See id. § 315.90. And in any event, as the Court already explained in Estes, presentation of the bond certificate is not the exclusive means for an individual to establish his or her ownership of the bond and consequent entitlement to redeem its proceeds. See 123 Fed. Cl. at 88–89. Thus, the regulations provide procedures by which a bond owner can secure redemption of bonds whose certificates have been "lost," or subject to "theft, destruction, mutilation, or defacement." 31 C.F.R. § 315.25 (authorizing "[r]elief, by the issue of a substitute bond or by payment" for lost, stolen, destroyed, or mutilated bonds). In such circumstances, the owner is required to provide either the serial number of the bond or other information that will allow Treasury to identify it by serial number. Id. § 315.26. Presumably, the purpose of these requirements is to enable Treasury to confirm through its records that the claimant is the bond owner, notwithstanding that he or she cannot produce the physical bond certificate.[15]

Counsel for the government in this case has taken the position that the certificates for the absent bonds cannot be deemed "lost" within the meaning of the regulations because Kansas never physically possessed them. But it is not apparent to the Court why an item is not "lost" where its owner is unaware of its location, whether or not the owner

---

addressing a different issue, can be read to endorse an interpretation of the former § 315.20(b) that is at odds with this Court's interpretation, the Court respectfully disagrees.

[15] It bears noting that under the regulations, where Treasury redeems bonds that are lost, it may protect itself against duplicate claims by "requir[ing] a bond of indemnity" as "necessary to protect the interests of the United States." 31 C.F.R. § 315.25.

ever had the item in his possession. Moreover, the government has not supplied the Court with any basis for determining whether Treasury's official interpretation of the scope of 31 C.F.R. § 315.25 is as narrow as the one counsel proposes, or how Treasury has applied the regulation in the past.

In fact, counsel's narrow interpretation of § 315.25 appears to conflict with the requirement in § 315.20(b) that Treasury "recognize" claims against registered owners of savings bonds if established by valid, judicial proceedings, as well as 31 C.F.R. § 315.23(a), which provides that the validity of the judicial proceedings is established by presentation of certified copies of the final judgment. For if prior possession of the paper certificate is invariably required in order for an owner to claim them "lost," then Treasury in fact would be unable to "recognize" claims of ownership based on valid judicial proceedings, as § 315.20(b) requires, where, for example, the prior owner of a bond had lost the physical certificates. It could also not recognize ownership claims where the prior owner refused to turn over the physical certificates, such as, for example, in the wake of a contentious divorce.[16]

It is certainly clear that 31 C.F.R. § 315.25 was intended to afford relief to bond owners in circumstances in which, for reasons beyond their control, they are unable to prove their ownership by presenting the bond certificate. And where ownership is conferred by a judicial determination, it would seem that submission of the certified judgment would suffice to prove such ownership. See id. § 315.23. But even leaving that aside, in light of the remedial purposes of § 315.25, and the anomalous results that would ensue if counsel's position were adopted, the Court finds unpersuasive Treasury's argument that bond certificates can never be considered "lost" unless they were once in the current bond owner's possession.

Finally, in any case, it is neither necessary nor appropriate for the Court to determine at this stage in the proceedings whether Kansas is entitled to redeem the bonds under the provisions of 31 C.F.R. § 315.25. For one thing, Kansas has not yet been afforded its rights as an owner of the bonds to make a claim for their proceeds based on the theory that they are "lost." It also has not been given access to the information that it needs to make such a claim, including the serial numbers of the absent bonds, or the names of their original owners. Presumably, with additional identifying information in hand, Kansas may be able to determine whether or not the certificates can be located or whether instead they have been "lost" or destroyed.

*     *     *     *     *     *

---

[16] In that vein, the Court notes that the regulation specific to divorce proceedings does not mention surrendering the physical bond; rather, it states (1) that Treasury will "recognize a divorce decree that ratifies or confirms a property settlement agreement disposing of bonds or that otherwise settles the interests of the parties in a bond"; (2) that "[t]he evidence required under § 315.23 must be submitted in every case"; and (3) that "[p]ayment, rather than reissue, will be made if requested." See 31 C.F.R. § 315.22(a).

On the basis of the foregoing, and for the reasons set forth more fully in Estes, the Court stands by its ruling that state court proceedings leading to judgments of escheat are among the valid judicial proceedings referenced in Treasury's regulations at 31 C.F.R. § 315.20(b). It also continues to find unpersuasive Treasury's argument that possession of the bond certificates is a pre-requisite to the recognition of a state's ownership rights under Treasury's regulations, where such ownership is conferred through valid judicial proceedings. Finally, it rejects as unpersuasive and premature Treasury's argument that its regulations preclude Kansas from redeeming the bonds that it owns unless it supplies Treasury with the bond certificates. The Court turns now to the government's additional bases for refusing to recognize Kansas's ownership of the absent bonds.

### B.        Whether Kansas's Escheatment Law is Preempted

In addition to its argument that § 315.20(b) does not by its terms apply to claims of ownership based on state court escheat judgments, the government contends that Kansas cannot be the "rightful owner of the Absent Bonds because its ownership claim is based on a state court escheat judgment that rests on a state statute that is preempted by Federal law." Def.'s Mot. at 10. Treasury's preemption argument is without merit.

### 1.        Preemption Standards

It is well established that where a state law comes into conflict with a federal law, the state law must give way. E.g., Hillsborough Cty. v. Automated Med. Labs., Inc., 471 U.S. 707, 712 (1985); see also Free, 369 U.S. at 669. This principle applies not only when the state law "actually conflicts" with federal law, but also if the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives" of the federal government. Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta, 458 U.S. 141, 153 (1982) (quoting Hines v. Davidowitz, 312 U.S. 52, 67 (1941)); see also Wyeth v. Levine, 555 U.S. 555, 565 (2009); Allergan Inc. v. Athena Cosmetics, Inc., 738 F.3d 1350, 1355 (Fed. Cir. 2013).

"In all pre-emption cases," the court "start[s] with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.'" Wyeth, 555 U.S. at 565 (quoting Medtronic, Inc. v. Lohr, 518 U.S. 470, 485 (1996)). "[T]he purpose of Congress," therefore, "is the ultimate touchstone in every pre-emption case." Id. (quoting Medtronic, Inc., 518 U.S. at 485; see also Retail Clerks Int'l Ass'n v. Schermerhorn, 375 U.S. 96, 103 (1963). Where Congress leaves the implementation of a statute to an agency, a "regulation with the force of law [may] pre-empt conflicting state requirements." Wyeth, 555 U.S. at 576; see also Hillsborough Cty., 471 U.S. at 713 ("[S]tate laws can be pre-empted by federal regulations as well as by federal statutes."); Free, 369 U.S. at 666–69 (operation of state community property law displaced by right of survivorship embedded in Treasury's savings bond regulations).

Unless Congress has specified otherwise, agencies have no special authority to pronounce on preemption. See Wyeth, 555 U.S. at 576–77. Nevertheless, agencies are "likely to have a thorough understanding of [their] own regulation[s] and [their]

objectives," <u>Geier v. Am. Honda Motor Co.</u>, 529 U.S. 861, 883 (2000), and thus may have "an attendant ability to make informed determinations about how state requirements may pose an obstacle" to federal law, <u>Wyeth</u>, 555 U.S. at 577 (quotation omitted); <u>see also</u> <u>Geier</u>, 529 U.S. at 883. The weight accorded to the agency's explanation "depends on its thoroughness, consistency, and persuasiveness." <u>Wyeth</u>, 555 U.S. at 577 (citing <u>United States v. Mead Corp.</u>, 533 U.S. 218, 234–35 (2001) and <u>Skidmore v. Swift & Co.</u>, 323 U.S. 134, 140 (1944)).

####    2.    Application of Standards

Treasury urges the Court to find that the Kansas law, which presumes bonds abandoned five years after their maturity date if the owner has not communicated with Treasury, conflicts with federal law, which it contends "allows savings bond owners to hold their bonds after maturity and has no deadline for owners to redeem their bonds."[17] Def.'s Mot. at 10–12; Def.'s Reply at 3–15. Further, the federal government argues, the Kansas law creates an obstacle to the accomplishment of the objectives of the federal savings bond program. It reasons that "[f]ederal savings bonds are attractive to purchasers in part because they have no expiration date," and that "confidence in the U.S. savings bond program would be undermined" if a state were permitted "to impair [the bond owner's] contract rights." Def.'s Mot. at 12.

Treasury's arguments that the Kansas law and federal law are in conflict lack merit. First and foremost, for the reasons set forth above, and in <u>Estes</u>, this Court has concluded that federal law itself (i.e., 31 C.F.R. § 315.20(b)) requires Treasury to recognize claims of ownership based on title-based escheatment statutes. In fact, Treasury has not only represented to both the Third Circuit and the Supreme Court that it so interprets its regulations, it redeemed the bonds in Kansas's possession that Kansas obtained via the very unclaimed property law that Treasury now argues is preempted. Pl.'s Mot. App. at A358–59, 362.

Further, Kansas's law determines the identity of the bond owner, and not the time period within which the bond owner may redeem it. If Kansas lawfully becomes the owner of bonds pursuant to Treasury's regulations via a judgment of escheat (as the Court has already concluded), then the former bond holders no longer have a right under federal law to redeem the bonds because they no longer own them. As Treasury expressly observed in its 1952 Escheat Decision, in such circumstances payment of the proceeds to the State is "not regarded as a violation of the agreement, but, on the contrary, as payment to the bondholder in the person of his successor or representative."[18] Def.'s Mot. App. at A3 (emphasis omitted).

_____

[17] As noted above, under its Unclaimed Property Act, bonds that have been presumed abandoned do not escheat to Kansas until three years after the end of this five-year period. <u>See</u> Kan. Stat. Ann. § 58-3979(a).

[18] Treasury's argument based on 31 U.S.C. § 3105(b)(2)(A) fails for similar reasons. That provision authorizes Treasury to "prescribe regulations providing that . . . owners of

For similar reasons, the Court is not persuaded by the government's argument that the Kansas law makes ownership of federal bonds less attractive, thereby impairing the objectives of the federal savings bond program. The Court does not agree with Kansas that there is no value at all to a right to hold onto a bond over an extended period of time after it has stopped earning interest. But even under Treasury's own interpretation of its regulations, that right is subject to another party's claim of ownership based on "valid, judicial proceedings" for at least some categories of judgments. See 31 C.F.R. § 315.20(b).

Put another way, Treasury's regulations themselves expressly contemplate that the original bond owner may be deprived of his ownership interest in the bond, and thereby lose the right he once held as the owner to redeem the bond at any time after maturity. Thus, anyone who chooses to purchase a savings bond is already aware (at least constructively) that his right to hold onto the bond after it matures (and even while it is still earning interest) is not unlimited and may be affected by rulings issued in the course of valid judicial proceedings.

Finally, Treasury's reliance upon the Third Circuit's decision in Treasurer of New Jersey, which found certain custody-based state escheatment laws preempted by federal law, is unavailing. In that case, the Third Circuit held that "the federal statutes and regulations pertaining to United States savings bonds preempt the States' unclaimed property acts insofar as the States seek to apply their acts to take custody of the proceeds of the matured but unredeemed savings bonds." 684 F.3d at 407. "Most critically," it stated, "application of the States' unclaimed property acts would interfere with the terms of the contracts between the United States and the owners of the bonds because, according to the States' complaint, they effectively would substitute the respective States for the United States as the obligor on affected savings bonds." Id. at 408. Therefore, once the states took custody of the bonds' proceeds, the bonds' owners would have to follow the "procedures set forth in the various States' unclaimed property acts" rather than the federal redemption process, in order to secure their proceeds. See id. Further, the Third Circuit observed, the original bondholders (who remained the bond's owners) "still would have a contractual right to payment from the United States based on the terms of the bonds," exposing the federal government to the risk of double liability on the bonds. Id. at 409.

Title-based escheatment statutes do not raise the concerns identified by the Third Circuit in Treasurer of New Jersey because once ownership transfers to a state, the state

---

savings bonds may keep the bonds after maturity or after a period beyond maturity during which the bonds have earned interest and continue to earn interest." Id. Section 3105(b)(2)(A) thus concerns the rights that Treasury may choose to confer upon "owners"; it is agnostic as to who the owner is. Further, Treasury's argument is purely academic, as Treasury has not, in fact, prescribed regulations allowing the absent bonds at issue in this case to continue to earn interest. The Court therefore is not confronted with a situation where a state seeks recognition of its ownership of bonds that are still earning interest.

is not the obligor on the bonds; it is their owner. And when the state takes title, the former owners' rights to payment from the federal government are extinguished. The government therefore cannot be liable for double payment. Further, the state must follow existing federal regulations to redeem the bonds. Thus, as the Third Circuit recognized, its holding "does not nullify state escheat laws for, as provided in the federal regulations and as recognized by the Treasury, third parties, including the States, may obtain ownership of the bonds—and consequently the right to redemption—through 'valid[] judicial proceedings.'"[19] Id. at 412–13 (quoting 31 C.F.R. § 315.20(b) (alteration in original)).

In short, the federal government's argument that the Kansas law is preempted because it conflicts with or presents an obstacle to federal law is without merit. The Court now turns to its related argument that the Kansas law is inconsistent with principles of intergovernmental immunity.

## C. Whether the State Statute Violates Principles of Intergovernmental Immunity

Under the principle of intergovernmental immunity, states may not "directly regulate the federal government's operations or property." Id. at 410 (citing Arizona v. Bowsher, 935 F.2d 332, 334 (D.C. Cir. 1991)); see also Hancock v. Train, 426 U.S. 167, 178–80 (1976); McCulloch v. Maryland, 17 U.S. (4 Wheat.) 316, 426–27 (1819). In other words, states may not "regulate the [federal] [g]overnment directly." North Dakota v. United States, 495 U.S. 423, 434 (1990) (plurality opinion); see also United States v. City of Arcata, 629 F.3d 986, 991 (9th Cir. 2010) (invalidating local ordinances prohibiting military recruiters from contacting teenagers because the ordinances "s[ought] to directly regulate the conduct of agents of the federal government").

Treasury argues that Kansas's unclaimed property law directly regulates the federal government because that law seeks to "compel payment of unredeemed bond proceeds from the Federal Treasury based on [a] state imposed deadline[] for registered owners to redeem their bonds." Def.'s Mot. at 15. According to the government, "Kansas

---

[19] In Treasurer of New Jersey, the Third Circuit explicitly observed that "in concluding that the State custody-based unclaimed property acts are preempted we are distinguishing, as does the Government itself, those acts from title-based acts." 684 F.3d at 413 n.28. It stated, however, that it did not wish to "imply that our result would be different" in the event that (1) the government was "confronted with a judgment of escheat under a title-based escheat act," and (2) Treasury "abandoned its long held position as reflected in the Escheat Decision and refused to recognize the enforceability of the judgment with respect to savings bonds or their proceeds." Id. Thus, the Third Circuit recognized that so long as Treasury's regulations require Treasury to recognize state claims of ownership based on title-based escheatment statutes (which the Court has concluded the former regulations did), such statutes are not pre-empted by federal law.

would then be able to use money now in the Federal Treasury to fund its own state programs and operations." Id.

This argument lacks merit for many of the reasons articulated above. First, it is incompatible with Treasury's decision to redeem the bonds in Kansas's possession, which Kansas obtained via the same unclaimed property law Treasury now contests. Second, nothing in Kansas's law requires the government to pay funds to Kansas on terms set by Kansas. Rather, Kansas seeks payment pursuant to Treasury's own regulations—i.e., by obtaining title to the bonds via judicial proceedings under 31 C.F.R. § 315.20(b) and then seeking redemption as the owner of the bonds.

Treasury's reliance on Treasurer of New Jersey and Bowsher is thus unavailing. In the Treasurer of New Jersey litigation, the states acknowledged that they did not own the bonds they wanted to redeem and framed their claim as an APA claim seeking relief other than monetary damages. See McCormac v. U.S. Dep't of Treasury, 185 F. App'x 954, 956 (Fed. Cir. 2006) (concluding that it would be improper to transfer the Treasurer of New Jersey litigation to the Court of Federal Claims and observing that "the States neither assert[ed] that they currently ha[d] title to the bonds, nor s[ought] transfer of title to the bonds"). Bowsher similarly involved states seeking only custody over funds in the government's hands. See 935 F.2d at 334 (observing that states seeking custody over funds in a federal unclaimed property fund "claim[ed] no escheat," but rather "s[ought] only temporary custody over the money until the rightful owners appear with valid claims").

Indeed, the court in Bowsher seemingly anticipated a situation like this one, noting that "escheat of the claimant's right might well substitute the state for the claimant and entitle it to payment." See id. at 335. In such a case, the court cautioned, the substitution would need to occur in a manner "consistent" with the relevant statutes. See id. As described above, Treasury has long acknowledged that transfers pursuant to title-based escheat proceedings are consistent with its regulations, leaving open the possibility that Kansas might be substituted for the original owners of the absent bonds pursuant to such proceedings. Bowsher thus does not support Treasury's intergovernmental immunity argument.

In sum, because under Treasury's regulations, the operation of Kansas's Unclaimed Property Act grants Kansas title over the savings bonds at issue, the Act does not directly regulate the federal government's operations or property. The principle of intergovernmental immunity therefore does not invalidate Kansas's unclaimed property law.

**D.**     **Whether the State Proceedings Were Invalid Because They Did Not Comport with the Due Process Clause**

The government's final contention is that the state court proceedings did not effect a valid transfer of ownership because those proceedings did not comport with the

due process requirements of the Fourteenth Amendment.[20] Def.'s Mot. at 17–18; Def.'s Reply at 20–25. First, it argues that the judgment was defective because the "state court did not identify a constitutional basis for exercising in rem jurisdiction over the Absent Bonds." Def.'s Mot. at 17; see also Def.'s Reply at 24–25. Second, it claims that "the state court failed to give the owners of the Absent Bonds constitutionally adequate notice of the escheat proceeding." Def.'s Mot. at 18; see also Def.'s Reply at 23. Both arguments lack merit.

Regarding the first issue, as Kansas correctly observes, savings bonds are a form of intangible property. See Pl.'s Mot. at 46–47 (citing Blodgett v. Silberman, 277 U.S. 1, 10 (1928)). As the Supreme Court has observed, "intangible property, such as a debt which a person is entitled to collect, is not physical matter which can be located on a map." Texas, 379 U.S. at 677; see also Hanson v. Denckla, 357 U.S. 235, 246–47 (1958) (noting, with respect to in rem jurisdiction, that "the situs of intangibles is often a matter of controversy" and that "[i]n considering restrictions on the power to tax, th[e] Court has concluded that jurisdiction over intangible property is not limited to a single State" (quotation, citations, and footnote omitted)); Mullane v. Cent. Hanover Bank & Trust Co., 339 U.S. 306, 312 (1950) (observing that "[t]he legal recognition and rise in economic importance of incorporeal or intangible forms of property have upset the ancient simplicity of property law and the clarity of its distinctions" between in rem and in personam proceedings).

Further, in Texas, the Supreme Court held in a similar context that when in rem escheat proceedings involve intangible property that may be subject to several states' unclaimed property regimes, "the right and power to escheat the debt should be accorded to the State of the creditor's last known address as shown by the debtor's books and records." 379 U.S. at 680–81. According to the Court, this "clear rule" would "govern all types of intangible obligations." Id. at 678. The Court stated that the virtues of this rule include that it involves only "a factual issue [that is] simple and easy to resolve"; that it "recognizes that the debt was an asset of the creditor"; and that it "tend[s] to distribute escheats among the States in the proportion of the commercial activities of their residents." Id. at 681. "It may well be that some addresses left by vanished creditors will be in States other than those in which they lived at the time the obligation arose or at the time of the escheat," the Court continued, "[b]ut such situations probably will be the exception, and any errors thus created, if indeed they could be called errors, probably will tend to a large extent to cancel each other out." Id.

_____

[20] Kansas asserts that the government lacks standing to raise the due process issue "on behalf of the bond owners." See Pl.'s Mot. at 43. But the government is not raising the due process issue on behalf of the owners; rather, it asserts the issue as a basis for finding that the state's claims of ownership are not based on valid judicial proceedings, so that Treasury is not contractually obligated to honor them. The Court therefore rejects Kansas's suggestion that the government somehow lacks standing to raise this defense to Kansas's breach of contract action.

Treasury offers no persuasive reason why the <u>Texas</u> rule ought not apply here. Its observation that "the state court did not find that the Absent Bonds are in Kansas" is of no moment: because the bonds are intangible property, the inquiry turns on what the facts reveal about the bondholders' last known addresses. <u>See</u> Def.'s Mot. at 17. Treasury's concern that addresses in its records may "reveal[] nothing about the present location of the bonds or their current owners" was addressed in <u>Texas</u>, as just described. <u>See id.</u> And its protest that bonds may "pass by inheritance to persons other than the purchaser" who live elsewhere is unavailing: under 31 C.F.R. § 315.70, surviving heirs may request reissue or payment upon the bondholder's death, obviating Treasury's concern. <u>See id.</u> at 18.

There is also no merit to Treasury's argument that <u>Texas</u> is distinguishable because, unlike the property at issue in that case, U.S. savings bonds are "a form of property created under Federal laws that establish the registered owners' right to redeem them at any time and the United States' expectation that the physical bond be presented for payment in all but exceptional cases." Def.'s Reply at 24. This contention, like Treasury's preemption argument, cannot be reconciled with the governing regulations, which provide for transfers of ownership that displace the original registered owners' expectations regarding redemption.

Treasury's argument as to the constitutional adequacy of the notice Kansas provided to the absent bondholders is also inconsistent with Supreme Court precedent. In <u>Mullane</u>, the Court held that to comport with the Due Process clause, notice must be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." 339 U.S. at 314. Whether this standard has been met depends on "the practicalities and peculiarities" of the individual case. <u>Id.</u> And, as <u>Mullane</u> shows, the Due Process Clause allows for the disposition of property interests where, as here, notice by publication is the only practical option.

Thus, in <u>Mullane</u>, a state law allowing for common administration of small trusts permitted the administrator from time to time to seek judicial settlement of claims arising against the trustee. <u>Id.</u> at 307–09. Regarding notice, the law required only that the administrator publish notice of the settlement proceedings in a local newspaper for four consecutive weeks. <u>Id.</u> at 309–10.

In assessing the adequacy of this procedure under the Due Process Clause, the Court divided the trust's beneficiaries into two categories: beneficiaries "whose interests or whereabouts could not with due diligence be ascertained," and "known present beneficiaries of known place of residence." <u>Id.</u> at 317–18. The Court held that notice by publication satisfied the Due Process Clause with respect to the first category of beneficiaries. <u>Id.</u> Acknowledging that "publication alone" was hardly a "reliable means of acquainting interested parties of the fact that their rights are before the courts," <u>id.</u> at 315, the Court nevertheless concluded that it was "not in the typical case much more likely to fail than any of the choices open to legislators endeavoring to prescribe the best notice practicable," <u>id.</u> at 317.

In contrast, "[a]s to [the] known present beneficiaries of known place of residence," notice by publication did not suffice. Id. at 318 (observing that "[e]xceptions in the name of necessity do not sweep away the rule that within the limits of practicability notice must be such as is reasonably calculated to reach interested parties" and that "[w]here the names and . . . addresses of those affected by a proceeding are at hand, the reasons disappear for resort to means less likely than the mails to apprise them of its pendency.").

According to the Court, "[i]t [was] not an accident that the greater number of cases reaching th[e] Court on the question of adequacy of notice have been concerned with actions founded on process constructively served through local newspapers." Id. at 315. Among these were several cases involving state unclaimed property regimes and their treatment of languishing bank deposits. See Anderson Nat'l Bank v. Luckett, 321 U.S. 233 (1944); Sec. Sav. Bank v. California, 263 U.S. 282 (1923). As most relevant here, the Court in Luckett held that, in addition to the notice afforded by publication, "[t]he [unclaimed property] statute itself is notice to all depositors of banks within the state[] of the conditions on which the balances of inactive accounts will be deemed presumptively abandoned, and their surrender to the state compelled." 321 U.S. at 243. Further, the Court cautioned, "[a]ll persons having property located within a state and subject to its dominion must take note of its statutes affecting the control or disposition of such property and of the procedure which they set up for those purposes." Id.

Here, as in Mullane, the necessary notice had to be provided to two categories of property owners: the individuals whose bonds were in Kansas's possession and the original owners of the absent bonds. Regarding the bonds-in-possession, Kansas attempted to locate bond owners "us[ing] both internet search sites and LexisNexis record searches . . . . as well as searching obituaries[] and records of probate proceedings." Pl.'s Mot. App. at A189. Upon locating potential owners, Kansas sent them "claim packets . . . informing them of the existence" of the bonds. Id.

With respect to the absent bonds, Kansas attempted to obtain information about the original owners' names and last known addresses from Treasury, but Treasury refused to provide it. See id. at A208–09 (denying FOIA request); id. at A345–47 (same); id. at A355 (denying FOIA appeal). Notably, Treasury did not deny that such bondholders existed; instead, it stated that it withheld the requested records because, in Treasury's view, they were FOIA-exempt. See id. at A347.

Thus, as in Mullane, Kansas could not discover individualized information about the absent bondholders through the exercise of reasonable diligence. Further, as in Luckett, the 2000 amendment to Kansas's unclaimed property law (as well as Treasury's regulations and its decades-long position regarding states' rights to secure title to federal savings bonds pursuant to valid judicial proceedings) provided some notice of the possibility that bonds might escheat in the future. Accordingly, considering the "practicalities and peculiarities" of this case, the Court concludes that Kansas supplied constitutionally adequate notice of the state court proceedings to the absent bondholders.

In summary, the Court concludes that the state court did not violate the Due Process Clause when it asserted in rem jurisdiction over the absent bonds, and that Kansas's efforts to notify the absent bondholders of the proceeding via publication passed constitutional muster. Accordingly, for the reasons discussed above, the Court rejects the government's argument that the state court escheatment proceedings were not valid judicial proceedings within the meaning of 31 C.F.R. § 315.20(b).[21]

### E.    Kansas's Fifth Amendment Takings Claim

As noted above, in Count VII of its complaint, Kansas alleged that Treasury's failure to redeem the absent bonds amounted to a taking of its property without just compensation. See Compl. ¶¶ 141–43. In its ruling on the government's motion to dismiss, the Court denied the government's motion with respect to the takings claim because, under Federal Circuit precedent, a plaintiff may "alleg[e] in the same complaint two alternative theories for recovery against the Government . . . one for breach of contract and one for a taking under the Fifth Amendment to the Constitution." See Estes, 123 Fed. Cl. at 91 (quoting Stockton E. Water Dist. v. United States, 583 F.3d 1344, 1368 (Fed. Cir. 2009)). In Stockton East, the Federal Circuit also observed that "[i]t has long been the policy of the courts to decide cases on non-constitutional grounds when that is available, rather than reach out for the constitutional issue." 583 F.3d at 1368. For that reason, "when a case arises in which both a contract and a taking cause of action are pled, the trial court may properly defer the taking issue . . . in favor of first addressing the contract issue." Id. "[O]f course," the Federal Circuit continued, "when a plaintiff is awarded recovery for the alleged wrong under one theory, there is no reason to address the other theories." Id.

Here, the Court has determined that Kansas has succeeded to title over the bonds but it has not yet "awarded recovery" to Kansas on its breach-of-contract claims. Accordingly, the Court will defer ruling on the parties' cross-motions for summary judgment as to Kansas's takings claim pending further proceedings in the case.

### CONCLUSION

For the reasons discussed above, the Court concludes that Kansas is the lawful owner of the absent bonds pursuant to 31 C.F.R. § 315.20(b). As such, it is entitled to

---

[21] In Count IV of its complaint, Kansas argues that the government should be equitably estopped from denying its requests to redeem the absent bonds based on its recognition of Kansas's ownership of the bonds in possession, and upon the 1952 Escheat Decision as well as "other, similar statements made over the past sixty years that Treasury would recognize title-based state escheat statutes." Compl. ¶ 118. As the government points out, however, equitable estoppel may not be used as a basis to impose liability on the United States. See Office of Pers. Mgmt. v. Richmond, 496 U.S. 414, 426–30 (1990); Doe v. United States, 372 F.3d 1347, 1356–57 (Fed. Cir. 2004) (citing Schweiker v. Hansen, 450 U.S. 785 (1981)). Accordingly, the government is entitled to judgment as a matter of law with respect to Count IV.

receive from the government the information necessary to allow it to make a request to redeem the bonds. Accordingly, Plaintiff's motion for partial summary judgment as to liability is **GRANTED** as to Counts I, II, III, and VI of its complaint. The government's motion for summary judgment is **GRANTED** as to Count IV of Plaintiff's complaint; otherwise it is **DENIED**.

The parties shall file a joint status report by **August 21, 2017**, suggesting further proceedings in this case.

**IT IS SO ORDERED.**

s/ Elaine D. Kaplan
ELAINE D. KAPLAN
Judge